[Cite as *In re A.F.*, 2018-Ohio-310.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **A.F.** | : | C.A. CASE NOS. 27611/27625 |
| | : | |
| | : | T.C. NO. JC 2014-2041 |
| | : | |
| | : | (Civil Appeal from |
| | : | Juvenile Court) |
| | : | |
| | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 26th day of January, 2018.

. . . . . . . . . . .

SARAH HUTNIK, Atty. Reg. No. 0095900, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

SEAN BRINKMAN, Atty. Reg. No. 0088253, 10 W. Monument Avenue, Dayton, Ohio 45402
    Attorney for Appellant-Father

GARY SCHAENGOLD, Atty. Reg. No. 0007144, 4 E. Schantz Avenue, Dayton, Ohio 45409
    Attorney for Appellant-Mother

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the June 1, 2017 Notice of Appeal of G.A. ("Mother") and the June 12, 2017 Notice of Appeal of D.F. ("Father").  Mother and Father appeal from the juvenile court's May 18, 2017 "Amended Decision and Judgment Concerning Objections to the Decision of the Magistrate," which granted legal custody of Mother's and Father's daughter, A.F., to M.B. and P.B., Father's relatives, and parenting time to Mother and Father. We hereby affirm the judgment of the juvenile court.

{¶ 2}  Montgomery County Children Services ("the Agency") filed a dependency complaint on March 26, 2014, alleging that A.F. lacked adequate parental care. Specifically, the complaint alleged that Mother "was found to have roaches on her person and in her belongings" while in labor with A.F. in the hospital, and that she "had to be treated for the lice while in labor."  The complaint provided that Mother and A.F. "went to stay with maternal relatives on a temporary basis; however the relatives are unable to assume custody of this child.  It was reported that Mother has difficulty understanding this child's feeding schedule and prioritizing the baby's basic needs."  Also on March 26, 2014 the Agency filed a "Motion and Affidavit for Interim Temporary Custody at an Ex Parte Proceeding." On the same day, temporary custody of A.F. was granted to the Agency.

{¶ 3} On April 4, 2014, a "Magistrate's Order of Interim Temporary Custody" was issued, which provides that Mother and Father "have housing issues" and that Mother is developmentally delayed.  On May 16, 2014, an "Amended Dependency Complaint" was filed, which provides that A.F. is in the custody of the Agency, and that relatives M.B. and P.B. "visit with the child, and have expressed a desire to care for the child.  A home study was conducted and approved on [M.B. and P.B.]"  On May 27, 2014, Father filed a

motion for temporary custody of A.F. to be granted to K.W., A.F.'s maternal aunt. On July 1, 2014, Mother filed a motion for custody with protective supervision, or to Father, or to maternal cousin, B.C. On July 8, 2014, Father filed a motion for custody with protective supervision, or to B.C.

{¶ 4} On July 15, 2014, the Agency filed a "Motion and Affidavit to Transfer Temporary Custody to Relatives and Interim Order." The Agency sought to transfer temporary custody to paternal cousins M.B. and P.B. A hearing was held on July 10, 2014, and on July 16, 2014 a "Magistrate's Decision and Judge's Order of Adjudication and Disposition of Temporary Custody" was issued, granting temporary custody to the Agency. The Magistrate determined that Mother and Father "do not have safe and appropriate housing. Mother and [F]ather need to appropriately address their mental health issues. Based upon the credible testimony presented the Court finds that [M]other and [F]ather are not able to provide for the basic needs of the child as neither of them have appropriate housing or income."

{¶ 5} Mother objected to the decision on July 29, 2014. On July 30, 2014, a "Magistrate's Order of Interim Custody" was issued, granting interim temporary custody to M.B. and P.B. and weekly monitored parenting time to Mother and Father. On August 1, 2014, Father filed an "Objection to Magistrate Decision of 7/16/14."

{¶ 6} On August 5, 2014, the court issued an Entry and Order vacating the Magistrate's Order granting interim custody to M.B. and P.B., due to Mother's pending objections, and the court granted interim temporary custody to M.B. and P.B. The court scheduled a hearing on September 4, 2014 to determine whether temporary custody to M.B. and P.B. is in A.F.'s best interest.

{¶ 7} On August 6, 2014, the Agency responded to Mother's and Father's objections. On September 17, 2014, after a hearing, a "Magistrate's Decision and Judge's Order of Temporary Custody" was filed granting temporary custody of A.F. to M.B. and P.B.

{¶ 8} On November 21, 2014, with leave of the juvenile court, Father filed "Objections to Magistrate Decision of 7/16/14." On December 2, 2014, Mother filed a "Supplemental Objection to Magistrate Decision of 07/16/14." The Agency filed a reply on December 19, 2014. The juvenile court overruled Mother's and Father's objections on February 19, 2015. On April 15, 2015, the Agency filed a "Motion and Affidavit for First Extension of Temporary Custody to Relatives with Request for an Expedited Hearing." On July 14, 2015, the Agency filed a "Motion and Affidavit for Legal Custody to Paternal Cousins," and the issue was scheduled for a hearing on November 2, 2015. On October 6, 2015, Mother filed a "Motion for 2nd Extension of Temporary Custody," and on October 26, 2015, Father filed a "Motion for Legal Custody; Motion for 2nd Extension of Temporary Custody in the Alternative." On November 2, 2015, A.F.'s Guardian ad Litem filed a report recommending that A.F. be placed in the legal custody of M.B. and P.B.

{¶ 9} At the November 2, 2015 hearing, Kimberly Owens testified that she is "the Getting Ahead program facilitator from the Bridges out of Poverty," and that she has been working with Mother since July of 2015. Owens stated that Mother has never missed a class in the Getting Ahead program, and that they are in week ten thereof. She stated that she also meets with Mother one-on-one to reiterate what was learned in each class. Owens stated that Mother sometimes "doesn't understand due to lack of vocabulary and

communication." She stated that Mother's attitude is cooperative, and that she has made progress in her ability to regulate her emotions. Owens stated that she will perform an assessment of Mother's progress at the end of an 18-week period.

{¶ 10} Dr. Richard Bromberg next testified, and the parties stipulated to his expertise in clinical psychology. Bromberg stated that he performed psychological evaluations of Mother and Father on June 24, 2014. Bromberg stated that he gave Mother the Peabody Individual Achievement test to identify her reading comprehension level. He stated that Mother reads at a second-grade level, and that "she was not even able to comprehend even when the test was read to her." He stated that he gave her the Wechsler Abbreviated Scale test to determine her IQ, and that her score was 59. Bromberg testified that her result "indicates that her intellectual ability is at an extremely low level," and that "anything below a 69 is considered to be extremely low, and a 59 is quite low in terms of a person's intellectual ability." He stated that Mother's score suggests that she does not have the mental capabilities to parent a child to a reasonable degree of psychological certainty.

{¶ 11} Bromberg stated that he read the Axis II Personality Checklist to Mother because "we presumed that it would be easier for her to be able to understand," and that the test "gives us an idea of more significant, enduring personality patterns that represent dysfunctionality in a person's behavior." Bromberg stated that Mother exhibited "paranoid features, and there were narcissistic features, and we also were concerned about thinking problems that showed up also on the Axis II checklist." He stated that "there was solid evidence to suggest a personality disorder existing in her case" to a reasonable degree of psychological certainty.

**{¶ 12}** Bromberg testified that he was unable to administer the Parenting Stress Index test to Mother because she was unable to understand the questions. Bromberg stated that he administered the Child Abuse Potential Inventory, and that Mother's "lie scale is quite high. It's a 13," and "7 or higher suggests a higher level that a person is not representing themself [sic] accurately." He stated that the test "suggests that [Mother] is significantly answering the questions by minimizing or understating her psychological problems or behavior." As a result, Bromberg testified that "we can't identify whether she does or does not have characteristics similar to known active physical child abusers." According to Bromberg, Mother's "problems are likely much more significant than she is letting us know."

**{¶ 13}** Bromberg stated that he gave Mother a parenting questionnaire, and that the "most significant part of the parenting questionnaire is that when [Mother] was asked * * * what part of the problem that contributed to her having to be evaluated was hers, she indicated none. And when asked what she felt were her weaknesses as a parent, she said that she had no weaknesses." Bromberg stated he was concerned about Mother's "lack of being able to see what limitations there might be that she would have. She didn't present herself as compromised in any way in her ability to parent her child."

**{¶ 14}** Bromberg testified that he diagnosed Mother "with an adjustment disorder. She showed some anxiety and depression, some stress related to everything she was going through. She also showed a[n] intellectual diagnosis of mild mental retardation and also a personality disorder, not otherwise specified, with paranoid and narcissistic tendencies or features." He stated that Mother's "overall global assessment of functioning received a score * * * of 40" on a scale of zero to 100, with "100 representing

zero percent psychological impairment; zero representing 100 psychological impairment." Bromberg stated that 40 represents "very serious psychological impairment," and that "50 is the number that is used by the Bureau of Disability to determine if someone is eligible for Social Security Disability for psychological reasons."

{¶ 15} Regarding Mother's personality disorder with the paranoid and narcissistic features, Bromberg testified that it is "a more chronic, enduring, and very hard, if not impossible, to treat problem." Bromberg stated that the disorder would significantly impact her ability to parent A.F. He stated, "in terms of treatment, I felt that she would need intensive, ongoing parenting skills. Likely with having a supervisor present at all times; and some real life skill training, ongoing; ongoing case management because of a lot of needs for resources to help her * * *." Bromberg stated that Mother could be with A.F., "but there would have to be someone who was supervising 24 hours." He stated that Mother's "capabilities are limited by her intellectual limitations, by her personality disorder, where it's going to be hard to accept training and advice, and her own preoccupations are going to interfere." According to Bromberg, "when you put together her psychological limitations, her parenting issues, her lack of self-awareness, her very poor judgment, and her limited intelligence * * * it's going to be virtually impossible for her to be able to parent her child independently." Bromberg stated that A.F. would be at "[v]ery serious" risk if the court granted custody to Mother.

{¶ 16} Regarding Father, Bromberg testified that Father "indicated that he had experienced some very serious problems," namely two strokes and "some serious heart problems." Bromberg stated that Father "had a couple of stents put in in 2011 into his heart. He had been in a bad car accident." Bromberg testified that Father had to carry

nitroglycerin "just in case he had difficulty at any time."

{¶ 17} Bromberg stated that Father's scores on the Peabody Individual Achievement Test for reading comprehension were at a ninth-grade level. Regarding the Father's score on the Personality Assessment Inventory, Bromberg stated that the "most significant part of that test is the high level of defensiveness * * *. There was a score of 64. Anything over * * * 58, gives us cause for concern." He stated that the results represent a "minimizing of psychological behavior, psychological problems," and "inhibited a good interpretation of the results." According to Bromberg, he observed, "when we looked at the 344 responses that there were concerns about mood issues and some questions about personality disorder." Bromberg stated that he administered the Axis II Personality Checklist to Father, and that the "most significant part of the Axis II is that * * * there tended to be some significant narcissistic tendencies," suggesting that "a personality disorder was likely there." Bromberg stated that Father's Substance Abuse Screening Inventory suggested "a low to moderate probability that he had a * * * substance dependence disorder." He stated, however, that Father scored "an 8 on the defensive scale, which is suggestive that he is tending to minimize, understate, underrepresent his substance abuse behavior." Bromberg stated that Father's responses further indicate that he "tends to be very worn out, very exhausted in his life, and that he is often resentful." He stated that "there is an anger element that is suggested in his resentment, and that was consistent with some of the way he described to us the way he felt about being treated by [the Agency]." Bromberg testified that Father exhibited a "kind of blaming tendency to others but not really looking at himself and his own behavior."

{¶ 18} Regarding the Parenting Stress Index test, Bromberg stated that Father was

"highly defensive," and perceived A.F. "as being very significantly * * * distracting, and hyperactive and interfering with his ability to parent." Regarding the Child Abuse Potential Inventory that he administered to Father, Bromberg stated that Father's "lie scale was 12," which is "quite high, probably in the top 10 percent of the tests that I see in terms of defensiveness and minimizing psychological behavior. And so we're not able * * * to be able to tell whether he has characteristics similar to known active physical child abusers." Bromberg testified that Father "has a significant rigidity scale of 34, 30 being the cutoff. That suggests a significant dysfunctionality in his parenting philosophy and parenting practices. It suggests unrealistic expectations for his child. That's going to cause significant problems." Bromberg stated that on the test, Father "endorsed an item that said, spanking that only bruises is okay, and I've never seen that before."

{¶ 19} Bromberg stated that Father's responses on the parenting questionnaire reflect that Father "did not see himself as having any weaknesses as a parent. He completely minimized any limitations that [Mother] had, felt that she was completely capable of parenting a child independently, so the issues about judgment really came up." Bromberg testified that according to Father, "the problems were coming from Children Services for bringing this up."

{¶ 20} Bromberg stated that he conducted a family interview to observe Mother and Father with A.F., and the following exchange occurred:

> Q. * * * could you explain the purpose and the process of the family interview to us?
>
> A. A family interview is essentially for me to observe * * * a snapshot of the family with the child * * *. Typically, spend 15 to 30 minutes

just kind of seeing how the parents interact with the child * * *.

Q. Was * * * there anything particularly remarkable about the family session with this family?

A. I wouldn't say there was anything really remarkable, although when [A.F.] came in, both parents essentially didn't approach [A.F.] and didn't exactly know what to do, and then they did appropach her and kind of handed her off to - - you know, from one to other.

They didn't seem to know a lot about the child, and it was very hard to tell if there was any bond between * * * either of the parent[s] and * * * [A.F.].

* * *

A. I didn't see either of them doing anything bad, but there was almost a strangeness, a detachment of the parents from their child, which may have come from just not seeing the child very much.

{¶ 21} Bromberg stated that he diagnosed Father with "adjustment disorder. He seemed to be reacting with anxiety, * * * some depression, so an adjustment problem to everything that they were going through." He stated that there "was a question of a mood disorder. I did not make it a primary diagnosis. I made it a provisional diagnosis, because there were questions about mood and stability that concerned me." Bromberg stated that "from a psychological standpoint, his global assessment of functioning was a 58, * * * moderate to severe psychological impairment." According to Bromberg, Father exhibited "some chronic issues that he was going to have to deal with for, I mean, a very intense and long-term way." Bromberg stated that Father's "personality disorder, and if

he, indeed, has a mood disorder, which I can't determine from all the defensive responding * * * that would be a very volatile situation, creating higher risk from a psychological standpoint." Bromberg stated that Father has "a moderately severe risk of causing problems to his children, but when you put that together * * * with his parenting information, he becomes a high risk."

{¶ 22} Bromberg stated that because of Father's personality disorder, "the typical treatment is 24 months of group therapy, which, more specifically, is called dialectical behavior therapy. That's a weekly, 24-month treatment in a group combined with 24 months of individual therapy weekly." Bromberg testified that "in addition to that, I felt that anger management was indicated by his own indications to me of his chronic levels of anger; and also parent educations, I felt extensive would be needed." Bromberg stated that Father would need "a minimum of two years to get himself able to be considered for parenting effectively."

{¶ 23} When asked if Father could act as a supervisor for Mother, Bromberg responded that "Father totally minimizes if not ignores [Mother's] limitations, so he has at least no awareness at all and no appreciation of those challenges. He has his own issues which in and of themselves would warrant a safeguard from someone else. So he needs a safeguard; she needs a safeguard." He stated that "Father thought that perhaps if Mother were able to be given custody of the child back that if he goes out and works, which seems unrealistic at this time, that * * * then they could put the child in day care while he's gone, * * * but with the judgment shown by [Father] * * * that would not be a safeguard here." Bromberg stated that if custody were awarded to Mother and Father, A.F. would be at high risk.

{¶ 24} Maggie Lupton testified that she is a visitation specialist at the Agency. She stated that she performed the first of three visitation assessments of Mother and Father on March 18, 2015, at the home of K.W., who is M.B.'s mother. She stated that at the first assessment, A.F. was sleeping while Father was holding her, and "so the very first visit just consisted of a lot of conversations about the Agency, about their frustrations with the Agency, and * * * not really understanding why [A.F.] was taken from their custody." Lupton stated that she did not observe Mother hold A.F. at the first assessment. She stated that she next observed the family on April 29, 2015, and that she "just had observed [Father] doing the majority of the caretaking during that visit." According to Lupton, during this visitation, Mother "did seem angry, her * * * facial expressions, her tone. I did notice quite often she would just kind of order [Father] to do things." She testified that Mother was "starting to say 'no' to the baby when she was awake, just really in a stern tone." Lupton stated that A.F. "seemed upset, and [Mother] wasn't able to comfort her."

{¶ 25} Lupton testified that her final visitation assessment was on May 6, 2015. She stated that at the visitation, A.F. was awake and Father was feeding her lunch. After lunch, Lupton stated that Mother was excited to give A.F. a new toy that she had brought for her. Lupton testified that Mother became frustrated when A.F. "wasn't really interested in the toy." She stated that A.F. was "at that age where she was grabbing things and pulling at different things of her toys, and so [Mother] would yell 'no' to her again." She stated that Father "reminded her as well as myself that, [A.F.] doesn't know what she's not doing if you just keep saying 'no' and not explaining it to her." According to Lupton, Mother "did continue to just yell 'no' at her, because she shared that she liked how it

scared her." Lupton stated that A.F. "appeared to be afraid." Lupton stated that Mother told Father to replace the juice in A.F.'s bottle with pop and water, and "the caregiver intervened and just said she wasn't used to the pop and was just going to have * * * her juice."

{¶ 26} Lupton identified her report from the visitations, and she testified that she listed a concern about how A.F. was interpreting Mother's facial expressions and tones, since Mother "appeared angry at times where there seemed nothing to be angry about." Lupton stated that she was further concerned that Father "does not stand up for himself" when Mother ordered "him to do certain things for her." Lupton stated that at one visitation, Mother commented that since she had given birth to A.F., Father "can do all these things." Lupton described a "demanding tone rather than two parents working together." Lupton stated that Father told her at the last visitation that he had gotten a job and would be working at night while Mother and A.F. slept. She stated that Father "had shared that that would be a good thing because then [Mother] wouldn't really have to be alone with [A.F.]." Lupton stated that it "didn't seem like it was a plan that even he felt safe with, and just observing the interaction she had with her, or the lack of interaction, I didn't feel that it would be safe either." She stated that she did not observe Father successfully redirect Mother into appropriate parenting behaviors.

{¶ 27} Lupton stated that she recommended that the visitations remain supervised in K.W.'s home while Mother and Father worked on their case plan objectives. On cross-examination by counsel for Father, when asked about Mother's ability to parent independently, Lupton stated she "would have a concern based on the fact that * * * [Mother] seemed to just boss [Father] or demand [Father] to do things and put a lot of

parenting off on him, saying that it was his job or his turn." On redirect examination, Lupton stated that at the time of the visitations, Mother and Father "shared with me that they had been doing parenting [classes] for about a year."

{¶ 28} P.B. testified that Father is his cousin, and that he received temporary custody of A.F. in June of 2014. He stated that in the time that he has cared for A.F., Father has asked him for money three or four times. P.B. stated that he has not been to Mother's and Father's current residence, and that he never took his family to their previous residence "because I didn't want them exposed to the conditions of the home." He stated that the home "smelled highly of cat urine. There was clutter everywhere. There was dishes and moldy stuff." P.B. stated that he observed Mother and Father with A.F. at visitations, and that "[m]ost of the interactions with [A.F.] came with [Father]. He did a lot more of the interactions than * * * [Mother] did." He stated that Mother and Father had to be prompted when A.F. "needed to be fed and when she needed to be changed." P.B. stated that at Christmastime last year, Mother and Father wanted to take A.F. to get her picture taken with Santa Claus, and "they were insistent that it happen at a particular mall at a particular time." When P.B. was unable to coordinate his schedule to do so, he testified that Mother "threatened to have someone come over and hurt my family * * * or me if they didn't * * * get to have time with [A.F.] at Christmastime, Santa Claus time." P.B. stated that Mother and Father have poor hygiene, and that A.F. has "come back to our home after visitations," and "she's had to be bathed right away."

{¶ 29} P.B. stated that he lives in a two-story home with four bedrooms and two and one half bathrooms in a subdivision with his three children who are 10, five and three years old. He stated that A.F. has her own room there. P.B. stated that he works full

time and that his wife is a stay-at-home mother. P.B. stated that he thinks of A.F. as a daughter, and that she has "integrated really well into our family." He stated that "we do activities together, and she's included," and that the family is very bonded to A.F. P.B. stated that he has not received any financial assistance from Mother and Father, and that he is able to meet A.F.'s needs. P.B. testified that he "[d]efinitely" would like to have legal custody of A.F., and that he would be willing to set up a visitation schedule for Mother and Father.

{¶ 30} Jim Oberer testified that he is a caseworker at the Agency assigned to A.F.'s case. He stated that the Agency became involved with A.F. after nurses at the hospital expressed concerns that Mother and Father "were both asleep and not tending to the baby's needs, and also that they saw roaches in the belongings of the parents that they had there that day, and also that Mom had lice." Oberer stated that a case plan was developed for the family that they go over every month. He stated that Mother's objectives were to have a "parent/psychological completed," complete parenting classes, sign releases of information, visit with A.F., complete anger management and complete the recommendations of Dr. Bromberg. Oberer stated that Mother needed "extensive parenting classes" for 24 months. He stated that she completed "Promoting First Relationships" and is currently taking classes in Middletown at Catholic Charities.

{¶ 31} Oberer stated that he observed an early visitation with A.F., and that Mother was angry at Father, who was holding A.F., and she "just turns around and takes this cloth and just throws it. It hits [A.F.] in the head and just lays there." He stated that he told Mother "that could have been a bottle or a cup or anything when you threw that, and * * * she didn't understand that." Oberer stated that Mother began yelling, and "that's

when the police officer came down" to the visitation area due to the loud yelling. Oberer stated that Mother receives ongoing mental health treatment through Access Counseling and life skills training from Getting Ahead.

**{¶ 32}** Oberer stated that Father "is to do parenting classes; Dad is to have a parent psychological completed; Dad is to have adequate housing with no hazards; Dad is to have a job. * * * Dad is to sign all releases; Dad is to visit with the child weekly" and comply with Bromberg's recommendations.

**{¶ 33}** Oberer stated that he first visited Mother's and Father's home while A.F. was in foster care, and that the conditions were deplorable and unsafe. He stated that they moved from that home in July of 2014 to a trailer in Middletown. He stated that at the time of the move, Father "told me they were moving there because then the case would be - - be done and they would get their child back." Oberer stated that he told Father, "no, the case is still staying open. It's going to be in Montgomery County, but since you left and went there, it's going to be harder for me to try to find you" services. According to Oberer, Father "did a good job finding places for them to get their treatment for their case plan objectives, which was huge. He helped me out a lot there." Oberer stated that he visits the home every month. He stated when he "first went there, we had a hole in the ceiling where water was leaking through, and there was a bucket there where we'd sit and talk, and it was coming through." Oberer stated that "it can leak again, because there's still a tarp on top of the house." He stated that "[t]hen later on, the baby's room, it caved in, and it was right there where the baby's bed was. [Father] just got that fixed, looks like temporarily." According to Oberer, "every time I still go in there, if I'm sitting there, I'm going to have ants on me. I'm going to have bugs on me." Oberer

stated that "from the first day - - where you walk up the thing, and they have wooden steps where I walk into, and every time I look down as I'm knocking on the door, there's still * * * a knife down there, like a long knife."   He stated that "the first time I ever told them, I said, you can't have that there.   * * * That was still there the last time I was there." Oberer stated that Father "tells me he's employed" but has not shown him any pay stubs to verify his employment, and that Oberer has asked Father to provide a household budget, and that he has not done so.   Oberer stated that Father's mental health counseling, anger management and parenting education are ongoing

{¶ 34} Regarding the visitation schedule, Oberer stated that it was initially unsupervised while A.F. was in foster care, but that it was switched to supervised visitation after Mother and Father took A.F. into the men's room at the visitation center to videotape A.F. having her diaper changed.   He stated that Mother and Father agreed to have supervised visitation at K.W.'s home.   He stated that the Agency is seeking a grant of legal custody to M.B. and P.B. Oberer stated that the home of M.B. and P.B. is a "beautiful home," and that the home study there was approved.   He stated that he has no concerns about M.B. and P.B., and that he has observed the bond between them and A.F.   He stated that legal custody to M.B. and P.B. is in A.F.'s best interest because "this is where * * * she'll get all of her needs met, be cared for, and * * * we won't have to worry about the health of her or safety or anything like that."

{¶ 35} In response to cross-examination from counsel for Mother, Oberer stated that her parenting class objective and her anger management objective remain ongoing. When asked if he has observed improvement in Mother's anger management skills, Oberer responded, "No, she'll just go stand down the hallway and yell at me."   Regarding

the recommended life skills training, Oberer stated that he asked Mother "if she was willing to work. And we never got to that point, because she said, no." He stated, however, that Mother is currently engaged in life skills training. On cross examination by Mother's guardian ad litem, Oberer stated that the parents are both engaged in all the recommended services, but "I can't say they've made progress, no." In response to a question from counsel for Father about a second extension of temporary custody, Oberer stated, "* * * Dad is starting to make some progress, so yes, he is, in the classes. Mom attends the classes, but Mom is not demonstrating that she understands what is going on in the classes, and she's not * * * able to do those things that they're teaching in all these classes * * *." He stated that he "talked to my boss and we went through that * * * [and] it's been going on for a long time now. That's why we went for legal custody." He stated that "a few visits ago, * * * after the visitation was over, the neighbors could hear people outside arguing, and when they went outside, it was Mom and Dad arguing in the van. And the neighbor had to literally come out and tell them to stop before they called the police." He stated that Father "still has anger issues."

{¶ 36} In its December 7, 2015 "Magistrate's Decision and Judge's Order of Legal Custody," the Magistrate determined as follows:

> * * * The credible testimony established that mother and father have not made significant progress on their case plan objectives. More specifically, mother and father have housing and some improvements have been made by father but the credible testimony established that those improvements are temporary in nature and will require further labor. In addition, the credible testimony established that mother and father's home

continues to be infested with insects. Legal father has not verified any income which would assist him in providing for the basic needs of the child. With regard to mother, Dr. Bromberg testified within a reasonable degree of psychological certainty that mother has the following diagnoses: Adjustment Disorder and Mild Mental Retardation. Dr. Bromberg opined within a reasonable degree of psychological certainty, that mother does not have the knowledge, skills or ability to parent the child, or any child on an independent basis. Dr. Bromberg stated, "Her judgment and reasoning abilities are limited." With regard to legal father, Dr. Bromberg diagnosed father with Adjustment Disorder and Mood Disorder. Dr. Bromberg recommended that father engage in 24 months of group psychotherapy, 24 months of Individual Psychotherapy, 12 months of parenting education and six months [sic]. Dr. Bromberg opined that legal father is not able to independently parent the child and stated that "His limited judgment, limited self[-]awareness, and limited awareness of the needs of the children [sic] would likely place [A.F.] at risk of unintentional harm." Based upon the testimony presented the Court finds that legal custody to relatives is in the best interest of the child.

Pursuant to the order, legal custody of A.F. was granted to M.B. and P.B. with supervised parenting time to Mother and Father.

{¶ 37} On December 11, 2015, Father filed a "Notice of Objection to Magistrate's Decision; Request for Findings and Conclusions; Request and Pracipe [sic] for Transcript of Hearing; Motion for Extension of Time to File Objections and Motion; Motion to

Withdraw as Counsel; Motion for Appointment of New Counsel." On December 15, 2015, Mother filed an "Objection to Magistrate's Decision of December 7, 2015 and Motion for Leave to Supplement after Receipt of the Transcripts." On April 15, 2016, Mother supplemented her objections. She asserted that "the magistrate's decision to deny the extension of temporary custody and grant legal custody to a relative was not supported by the facts." On June 20, 2016, the Agency filed "Montgomery County Children Service's Reply to Supplemental Objections." The Agency asserted that the "objections in this case are without merit. The evidence is clear that both Mother and Legal Father have failed to address the concerns in the case plan."

{¶ 38} The juvenile court overruled Mother's and Father's objections on December 13, 2016 and awarded legal custody of A.F. to M.B. and P.B. An amended decision was issued on December 30, 2016 to add the name of counsel for Mother to the endorsement. Mother filed a Notice of Appeal on January 9, 2017 from the amended decision. Montgomery Appellate Case No. 27407. On January 31, 2017, the juvenile court issued a second amended decision, which provides that it was being "[a]mended to include consideration of Father's Supplemental Objections to Magistrate's Decision of December 7, 2015, which while properly filed by counsel was not present in the Court's case file." Mother and Father appealed the January 31 amended decision on February 7 and February 10, 2017 respectively. Montgomery Appellate Case Nos. 27451 and 27459. This Court consolidated Appeal Nos. 27451 and 27459 on April 3, 2017, noting that the Agency had moved to dismiss Appeal No. 27451 on the ground that the juvenile court lacked jurisdiction to enter the January 31 decision while Appeal No. 27407 was pending. On May 17, 2017, this Court agreed and dismissed the consolidated appeals to

allow for the issuance of a final appealable order. Appeal No. 27407 was dismissed on July 24, 2017 for lack of jurisdiction.

{¶ 39} In its May 18, 2017 "Amended Decision and Judgment Concerning Objections to the Decision of the Magistrate," the court thoroughly considered the relevant best interest factors set forth in R.C. 3109.04(F)(1). Pursuant to R.C. 3109.04(F)(1)(a), the court noted that both Mother and Father wished to receive custody of A.F. Pursuant to R.C. 3109.04(F)(1)(c), when considering A.F.'s interaction and interrelationships with Mother and Father, the court relied upon the testimony of Dr. Bromberg regarding the family interview he conducted, as well as Lupton's testimony regarding her visitation assessments, finding significant the multiple concerns expressed by both witnesses. The court noted that Bromberg "has concerns about the bonding between the child and both parents," and the court noted his testimony about "a strangeness or detachment that made it very hard to tell if either parent had a bond with the child." The court noted Bromberg's testimony that the parents did not immediately interact with A.F. The court recounted Lupton's testimony regarding her three visitation assessments at the home of K.W., and her concerns that Mother never held A.F. during the first visitation, that Mother seemed angry at the second and third visitation and told A.F. "no" repeatedly, and was unable to comfort her. The court noted Lupton's testimony that Mother became frustrated when A.F. lacked interest in a new toy, and it was significant to the court that A.F. "seemed afraid at this visit which Mother recognized and seemed to enjoy." The court noted that Lupton expressed "several concerns" in her report, such as Mother making demands of Father, Father not standing up for himself, Mother's limited interactions with A.F. relative to Father's, Mother's remark that since she gave birth to

A.F., Father can provide all of A.F.'s care, and Mother repeatedly telling A.F. no for no reason.

{¶ 40}  The juvenile court also cited the testimony of P.B. regarding A.F.'s bond to the family of M.B. and P.B. The court noted that P.B. testified that he observed Father interact with A.F. more than Mother.  The court noted that M.B. is a stay-at-home mom who cares for A.F. and the other three children in the home.  It was significant to the court that P.B. "treats the child as one of his own biological children and thinks of her as his daughter."

{¶ 41} Regarding A.F.'s adjustment to her home, pursuant to R.C. 3109.04(F)(1)(d), the court noted that A.F.'s needs were being met by M.B. and P.B., that she is bonded to the family, and that the Agency had no concerns about the family receiving custody of A.F.   The court noted that M.B.'s and P.B.'s home was approved in a home study.

{¶ 42}  Regarding the mental and physical health of all persons involved, pursuant to R.C. 3109.04(F)(1)(e), the court thoroughly considered Bromberg's individual evaluations, results and diagnoses of Mother and Father, noting in part that Bromberg "opined that there is nothing that Mother could do to allow her to successfully parent a child," and that "Father is not appropriate to supervise Mother parenting the child because he totally minimizes, if not ignores, Mother's limitations. * * * Moreover, Father has his own issues which in and of themselves warrant the need for a safeguard."   It was significant to the juvenile court that both "Mother and Father need a safeguard in place to parent the child appropriately," and that if "custody were awarded jointly to Mother and Father, [A.F.] would be at a high risk for harm."

{¶ 43} Pursuant to R.C. 3109.04(F)(1)(f), the court noted that P.B. "would be willing and able to set up a visitation schedule for Mother and Father." Pursuant to R.C. 3109.04(F)(1)(g), the court noted that no financial assistance has been received from either parent for A.F.'s care.

{¶ 44} The court then noted that in *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, "the juvenile court found legal custody to a relative was in the child's best interest pursuant to the best interest factors enumerated in R.C. § 2151.414(D), the same best interest factors considered in permanent custody cases." The court further analyzed A.F.'s best interest pursuant to those factors. In doing so, the court addressed Mother's and Father's individual case plan objectives, including Dr. Bromberg's recommendations. The juvenile court noted that "Mother's parenting class objective is still on-going because it was recommended that she participate in twenty four months of parenting classes," that she signed all releases, and that she visits with A.F. The court noted that Mother's "anger management therapy is ongoing, and unfortunately, Mr. Oberer has not observed Mother to have better coping skills in dealing with her anger." The court noted that Mother's mental health treatment is ongoing, and that Oberer has not "received any updates reporting that Mother has made progress, but she does attend the majority of sessions." The court noted Mother's initial refusal to attend life skills training, and that she is currently engaged in the training.

{¶ 45} The court noted that Father's parenting class objective is ongoing, since he, like Mother, was referred to a 24-month program. The court noted that Father's mental health therapy and anger management counseling are ongoing. Oberer's testimony regarding the condition of the parents' home was significant to the court, and the court

noted that there "is a tarp on the roof, the baby's room had a cave in above the bed that looks to be only temporarily fixed, the home is infested with bugs; and there is a large knife under the wooden steps leading to the door."  The court noted that Father "claims to be employed" but has failed to provide Mr. Oberer with any verification.  The court noted that Father signed all releases.

{¶ 46} The court found as follows:

MCCS believes that reunification of the child with either parent is not appropriate at this time or in the future because the case plan objectives have been ongoing for close to a year and a half with no real progress. While the parents are engaged in the services that have been requested of them, they are not making progress on the objectives.  Father is making some progress on his case plan objectives however, there is nothing that he has totally completed and learned.

{¶ 47} The court found that "an extension of temporary custody is not in the best interest of the child, that there has not been significant progress on either parent's case plan, and that it is not reasonable to believe that the child would be reunited with a parent within the extension period."  The court further found as follows:

* * * The Court notes that [the Agency] developed a case plan for the family as required by R.C. § 2151.412.  General services provided to the Mother and Father include case management, information/referral, and substitute care. The Court finds that while Mother and Father have attempted to address their case plan objectives, both of their case plans are incomplete.  The Court finds both Mother and Father's compliance with the

case plan objectives lacking. Accordingly, the Court finds the Agency made reasonable efforts to finalize a permanency plan, to eliminate the continued removal of the child from the home, and to make it possible for the child to return home safely.

**{¶ 48}** The court overruled Mother's and Father's objections and found legal custody to M.B. and P.B. to be in A.F.'s best interest and found "the parents unsuitable to parent the child. [M.B. and P.B.] have had temporary custody of the child since June 2014 and the parents have not made significant progress on their respective case plan objectives."

**{¶ 49}** Mother and Father each assert one assignment of error herein. Mother's assigned error is as follows:

THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY OF THE MINOR CHILD RATHER THAN GRANTING A SECOND EXTENSION OF TEMPORARY CUSTODY OF THE MINOR CHILD.

**{¶ 50}** Mother asserts that she "has been compliant with [the Agency], was engaged in all required case plan services, and was making progress to warrant a second extension of temporary custody," and that "Father's participation and progress with case plan services warrant a second extension of temporary custody. Further, there was reasonable cause to believe that reunification would occur during the extension and that it was in the child's best interest to grant an extension." She asserts that "she and Father continuously and diligently worked toward completion of the case plan objectives. Testimony established the parents had made some progress toward the objectives." Mother argues that this Court should "vacate the legal custody order, place A.F. in a

second extension of temporary custody and remand the case for further proceedings."

{¶ 51} As this Court has previously noted, a "court may award legal custody of a dependent child to a parent or to any other person who asks for legal custody or is proposed as a legal custodian. R.C. 2151.353(A)(3)." *In re R.H.B., L.M.B., and L.M.B.*, 2d Dist. Clark Nos. 2015-CA-12, 2015-CA-14, 2016-Ohio-729, ¶ 7.

{¶ 52} As this Court has noted:

> When a juvenile court makes a custody determination under R.C. 2151.353, it must do so in accordance with the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). See *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589, 1992–Ohio–144, paragraph two of the syllabus, and R.C. 2151.23(F)(1) (requiring a juvenile court to exercise its jurisdiction in accordance with R.C. 3109.04 as well as other sections of the Ohio Revised Code). The factors a court must consider in determining a child's best interest include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons. * * *

*In re D.S.*, 2d Dist. Clark No. 2013 CA 51, 2014-Ohio-2444, ¶ 9.

{¶ 53} As this Court has further noted:

> In a legal custody dispute, as opposed to a more drastic termination of parental rights, a court must find by a preponderance of the evidence that its decision is in the child's best interest. *In re A.W.,* 2d Dist. Montgomery

No. 21309, 2006–Ohio–2103, ¶ 6. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks,* 2d Dist. Darke No. 1646, 2005–Ohio–1912, ¶ 15, quoting *Black's Law Dictionary* 1182 (6th Ed.1998). The standard that a reviewing court uses to evaluate a manifest-weight challenge is familiar: " 'The court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 20 (saying that this standard applies in civil cases). "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co. v. City of Cleveland,* 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

*In re R.H.B., L.M.B., and L.M.B.,* ¶ 19.

**{¶ 54}** We "will not reverse the trial court's award of legal custody to [M.B. and P.B.] absent an abuse of discretion. *In re M.O.*, 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7." *In re J.T.*, 2d Dist. Montgomery No. 27343, 2017-Ohio-1303, ¶ 10. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR

123, 126, 482 N.E.2d 1248, 1252." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 55} As noted by the Ohio Supreme Court:

> The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, 47 O.O. 481, 483, 106 N.E.2d 772, 774. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.

*Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶ 56} We see no abuse of discretion in the juvenile court's denial of Mother's motion for a second extension of temporary custody and grant of legal custody of A.F. to M.B. and P.B. As set forth by the juvenile court, a review of the relevant factors reflects that the grant of custody in favor of M.B. and P.B. is in A.F.'s best interest. As the court

noted, pursuant to 3109.04(F)(1)(a), it is clear that Mother and Father wished to receive custody of A.F. As reflected in the juvenile court's analysis, however, the remaining relevant factors support the court's decision. Pursuant to R.C. 3109.04(F)(1)(c), regarding A.F.'s interactions with her parents, and M.B. and P.B., as noted by the juvenile court, Dr. Bromberg testified that in the course of the family interview, "it was very hard to tell if there was any bond between * * * either of the parents and the child," and that "there was almost a strangeness, a detachment of the parents from [A.F.]." As further noted by the juvenile court, Maggie Lupton testified that Mother did not hold A.F. during her first visitation assessment. She stated that Father provided most of the care during the second visitation assessment, while Mother appeared angry. Lupton testified that Mother kept saying "no" to A.F. in a stern tone, and that A.F. seemed upset and Mother was unable to comfort her. In the third visitation assessment, as noted by the juvenile court, Mother repeatedly yelled "no" at A.F. when she lacked interest in a toy Mother provided, even after Lupton and Father intervened on A.F.'s behalf and attempted to redirect Mother. As the juvenile court noted, Lupton testified that Father does not stand up for himself when Mother makes demands of him but rather acquiesces to Mother. As noted by the juvenile court, P.B.'s testimony was consistent with Lupton's that Father interacted with A. F. more than Mother.

{¶ 57} Regarding A.F.'s adjustment to her home, pursuant to R.C. 3109.04(F)(1)(d), the record reflects, as the juvenile court noted, that she has resided with M.B. and P.B. since June of 2014. P.B. testified that he has an appropriate home for A.F. and his three children, that he is able to meet all of her needs, and M.B. is a stay-at-home mother. As the court further noted, P.B. treats A.F. as his daughter. P.B. stated

that A.F. is very well integrated into the family, as the court noted, and that she is included in all of the family activities. P.B. expressed a desire for custody of A.F. The court noted that Oberer has no concerns about M.B. and P.B., that he has observed a bond between them and A.F., and legal custody in their favor is in A.F.'s best interest.

{¶ 58} Pursuant to R.C. 3109.04(F)(1)(e), the juvenile court thoroughly considered Mother's and Father's significant mental and psychological health issues. The court noted that Dr. Bromberg testified that Mother's intellectual ability is extremely low, that she has thinking problems, and a chronic personality disorder with paranoid and narcissistic features, as well as an adjustment disorder with some anxiety and depression. He stated that her global functioning score of 40 represents very serious psychological impairment. As noted by the juvenile court, Mother's lack of self-awareness is reflected in her statement to Bromberg that her behavior did not contribute to the need for her evaluations, and that she has no weaknesses as a parent. Bromberg stated that Mother would require 24 hour supervision to care for A.F., and that due to her lack of self-awareness and limited abilities, it would be virtually impossible for her to be able to parent A.F. independently. Based upon Bromberg's testimony, the court properly concluded that joint custody to Father and Mother would put A.F. at a high risk of harm.

{¶ 59} Further, as noted by the juvenile court, Bromberg testified that Father has had two strokes and has serious heart problems. As the court noted, based upon Father's significant narcissistic tendencies, Bromberg indicated that it was likely that Father had a personality disorder. The court noted that Bromberg stated that Father tended to blame others rather than examine his own behavior. It was significant to the court that Bromberg testified that Father's Child Abuse Potential Inventory suggests a

significant dysfunctionality in his parenting philosophy and parenting practices, including unrealistic expectations for A.F. Father indicated on the test that spanking that only bruises is acceptable. Like Mother, Father denied any weaknesses as a parent, and the court expressed concerns about Father's judgment when Father indicated that Mother was completely capable of parenting A.F. independently. Father was diagnosed with "adjustment disorder," and potentially a mood disorder, and Bromberg testified that his global assessment of functioning indicated moderate to severe impairment. Bromberg stated that Father indicated chronic levels of anger requiring anger management treatment. The juvenile court noted that Bromberg stated that Father could not act as Mother's supervisor in parenting A.F., and that he too needed to be supervised with A.F.

{¶ 60} Finally, as the juvenile court noted, Oberer testified that Mother's parenting class objective, her anger management objective, and her life skills training remained ongoing. While Mother attended the classes, she did not demonstrate that she understood what she was taught. Mother's and Father's home remained infested with insects and unsafe due to the temporary roof repair, including in the room intended for use as A.F.'s bedroom, and a visible knife that Father failed to remove after repeated admonitions. While Father indicated to Oberer that he was employed, he did not verify any employment. The Agency pursued legal custody due to the length of time that Mother and Father have received services without demonstrating significant progress. For the foregoing reasons, we agree with the juvenile court that a grant of custody in favor of M.B. and P.B. is in A.F.'s best interest, and we agree that Mother and Father could not have been reunited with A.F. within a second extension period.

{¶ 61} For the foregoing reasons, we conclude that the juvenile court's decision

denying the request for a second extension of temporary custody is supported by a sound reasoning process and by a preponderance of the evidence. Accordingly, Mother's sole assignment of error is overruled.

{¶ 62} Father's assigned error is as follows:

THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY BECAUSE CHILDREN SERVICES FAILED TO MAKE REASONABLE EFFORTS TO ELIMINATE THE CONTINUED REMOVAL OF THE CHILD FROM THE CHILD'S HOME OR TO MAKE IT POSSIBLE FOR THE CHILD TO RETURN HOME SAFELY.

{¶ 63} Father asserts that "Bromberg opined that [Father] could effectively parent the child if he engaged in treatment," and that reasonable efforts were not made to allow Father to complete his case plan objectives. He asserts that although 24 months of treatment was recommended, the November 2, 2015 hearing was held less than 17 months after the evaluations were completed. Father asserts that the Agency did not provide reasonable time for him to complete the recommended services. He asserts that Oberer did not testify regarding any referrals to assist him with obtaining adequate housing or income. Father asserts that the Agency "failed to make reasonable efforts to create a visitation plan that would support the reunification with [A.F.]." He asserts that despite the "appropriate care provided by Father, visitation has remained supervised at [K.W.'s] home."

{¶ 64} R.C. 2151.419(A)(1) requires the juvenile court to determine whether the Agency "has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it

possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts."

**{¶ 65}**   As this Court has previously noted:

" 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.,* 3d Dist. Wyandot Nos. 16–12-15, 16–12–16, 2013–Ohio–4317, ¶ 95, quoting *In re D.A.,* 6th Dist. Lucas No. L–11–1197, 2012–Ohio–1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." (Citation omitted.) *In re K.M.,* 12th Dist. Butler No. CA 2004–02–052, 2004–Ohio–4152, ¶ 23. *Accord In re C.O.,* 2d Dist. Montgomery No. 26610, 2015–Ohio–4290, ¶ 43.

We have also defined "reasonable efforts" as "a good faith effort which is 'an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.' The issue is not whether [the Agency] could have done more, but whether it did enough to satisfy the 'reasonableness' standard under the statute." *In re S.F.,* 2d Dist. Montgomery No. 25318, 2013–Ohio–508, ¶ 21, quoting *In re Secrest,* 2d Dist. Montgomery No. 19377, 2002–Ohio–7096, ¶ 13.

*In re N.M.*, 2d Dist. Montgomery Nos. 26693, 26719, 2016-Ohio-318, ¶ 53-54.

**{¶ 66}**   The record reflects no basis to conclude that the Agency failed to make

reasonable efforts. The Agency provided substantial services to the parents during the pendency of this matter. Oberer stated that a case plan was developed for the family that he went over every month with them. Mother and Father received psychological evaluations, and were administered the Peabody Individual Achievement Test, the Axis II Personality Checklist, the Child Abuse Potential Inventory, and a parenting questionnaire. Father was given the Parenting Stress Index. The parents were referred to extensive mental health counseling, parenting classes, and counseling for anger management.

{¶ 67} We disagree with Father's suggestion that Bromberg testified that Father could parent effectively after 24 months of treatment, and that he was not given reasonable time to complete treatment. Bromberg stated that Father would need "a minimum of two years to get himself able to be considered for parenting effectively." Further, Bromberg testified that Father had "chronic levels of anger," which would put A.F. at "high risk," and Oberer testified that Father had ongoing anger issues. Oberer stated that at a recent visitation, Mother and Father were arguing so loudly in their van after the visitation that a neighbor considered calling the police.

{¶ 68} Regarding Father's assertion that Oberer did not testify as to any housing and job referrals provided, Oberer testified that Father indicated to him that he and Mother moved to Middletown for the purpose of terminating Agency intervention, and he further indicated that he was employed. Bromberg testified that Father believed that the Agency created the problems resulting in A.F.'s removal.

{¶ 69} Regarding visitation, Oberer stated that visitation became supervised after Mother and Father videotaped A.F.'s diaper change, and he stated that at one visitation,

Mother threw a towel at Father in anger and yelled so loudly that a police officer responded. Lupton recommended that visitation remain supervised due to concerns for A.F.'s safety. Most significantly, while Oberer testified that Father was "starting to make some progress," Mother, despite class attendance, had not demonstrated any progress.

{¶ 70} Based upon the foregoing, we conclude that the Agency acted diligently in providing appropriate services for Father as well as Mother and sought legal custody after a reasonable time. Accordingly, Father's assigned error is overruled.

{¶ 71} Having overruled Mother's and Father's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Sarah Hutnik
Sean Brinkman
Gary Schaengold
John Pinard
Sarah Michel
P.B. and M.B.
Hon. Anthony Capizzi