[Cite as *In re A.T.*, 2019-Ohio-3527.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| IN RE: A.T., E.G., & D.G. | : | Appellate Case Nos. 28332 & 28355 |
|  | : |  |
|  | : | Trial Court Case Nos. 2016-4187 |
|  | : | 2016-4188 |
|  | : | 2016-4189 |
|  | : |  |
|  | : | (Appeal from Common Pleas Court – |
|  | : | Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of August, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 North Pioneer Boulevard, Springboro, Ohio 45066
        Attorney for Appellant/Father

SARA M. BARRY, Atty. Reg. No. 0090909, 1139 Holly Avenue, Dayton, Ohio 45410
        Attorney for Appellant/Mother

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Following the parents' separate objections to a magistrate's decision, the juvenile court awarded permanent custody of three-year-old D.G.[1] to the Montgomery County Department of Job and Family Services, Children Services Division ("the Agency"), and legal custody of D.G.'s siblings, 12-year-old A.T. and two-year-old E.G.,[2] to the non-family guardians ("Mr. & Mrs. H") with whom A.T. and E.G. had been living for more than two years. Mother, who is the parent of all three children, and Father, who is the "legal"[3] parent of D.G. and E.G.,[4] filed separate appeals from that judgment, which appeals have been consolidated before this Court. The judgment of the trial court will be affirmed.

## Factual and Procedural Background

{¶ 2} The Agency first became involved with Mother and her three children in or about January 2015, following a referral related to A.T.'s repeated absences from school. An investigation found that the home where Mother and the children were living was "very cluttered," with "little room for an adult to move or a child to play." (*See* Case No. 2016-4189, Doc. #73, p. 2.[5]) Other concerns also were recorded, including the "dirty and

---

[1] D.G. has turned four since the date of that decision.

[2] E.G. has turned three since the date of that decision.

[3] The record does not state whether Father is D.G. and E.G.'s biological father; however, the children do not share his or Mother's last name.

[4] A.T.'s father was a party before the juvenile court but did not appeal the trial court's judgment and is not a party here.

[5] Several documents appear in the record of more than one of the trial court cases, but the document numbering in the cases differs. Except as otherwise noted, document citations refer to the documents as they are numbered in Case No. 2016-4189.

unkempt" appearance of both A.T. and D.G., the two older children. (*Id.*) However, removal of the children was not found to be warranted at that time.

{¶ 3} On June 29, 2016, when Mother's mother ("Maternal Grandmother") dropped A.T. and D.G. at daycare, she told the staff that D.G. had a "sunburn" on his bandaged left leg. Upon unwrapping that leg, staff at the daycare saw what appeared to be "a severe second degree burn" that was "not consistent with a sunburn." (*Id.*) The daycare contacted the Agency, which contacted Mother and the police. Both A.T. and D.G. immediately were placed in the Agency's emergency custody. D.G. was transported to the hospital, where Mother met with an Agency representative and "gave several different stories as to what had happened" to D.G.'s leg, none of which was consistent with the injury. (*Id.*) The Agency also became aware of an earlier injury to D.G., evidenced by a large bruise at the base of D.G.'s skull detected by daycare staff on June 1, 2016.

{¶ 4} E.G., an infant, also was removed from Mother's care and transferred to the Agency's emergency custody at that time. E.G. was placed with non-relative caregiver Mrs. H, while A.T. initially was placed with a different caregiver.[6] On June 30, 2016, the Agency filed an abuse, neglect and dependency complaint as to D.G., as well as neglect and dependency complaints as to A.T. and E.G. By interim order entered that day, the juvenile court granted temporary custody of E.G. and A.T. to their respective caregivers and temporary custody of D.G. to the Agency. (Doc. #69.)

{¶ 5} Shortly thereafter, the Agency filed an initial case plan with a stated goal of returning all three children to parental custody. (Doc. #67.) The case plan noted that

---

[6] When that caregiver's home later failed to pass a home inspection, A.T. also was placed with Mrs. H.

Mother "appear[ed] to love her children very much" and "ha[d] a strong support system." (*Id.*) However, the plan also noted that Mother acknowledged experiencing mental health issues, lacked independent housing, had limited income, lived in "deplorable" conditions, and was in a relationship with Father, who had been convicted of domestic violence against Maternal Grandmother and also had two recent child endangering charges.[7]

{¶ 6} The plan set specific objectives for both Mother and Father. Mother was to 1) obtain and maintain stable housing, 2) obtain and maintain sufficient income to support her family, 3) follow up with recommended mental health counseling and comply with any recommendations, including as to medication, and 4) complete a parenting and psychological evaluation and follow through with all recommendations. Father was to 1) comply with all conditions of his probation and receive no new criminal charges, 2) successfully complete a domestic violence/batterer's intervention program, 3) follow through with mental health counseling and medication as indicated, 4) successfully complete a parenting and psychological evaluation and follow through with all recommendations, and 5) have stable income and housing and "financially and emotionally support his children." (*Id.*) Both Mother and Father signed the plan document.

{¶ 7} On August 24, 2016, a guardian ad litem ("GAL") appointed as to all three children filed a report with the juvenile court. The GAL reported that A.T. had been moved to live with Mr. and Mrs. H and that both A.T. and E.G. appeared to feel comfortable there. D.G. was in a different home with a foster family. According to the GAL, A.T. stated that Mother "can't take care of the [babies] she has." (Doc. #60, p. 2.) The GAL reported that

---

[7] Neither the identity of the children involved nor the outcome of those charges appears in the record.

A.T. also recently had "disclosed instances of abuse" by Father (who is not A.T.'s father.) Mother reportedly no longer was in a relationship with Father, but had begun a new relationship. The GAL stated that although A.T. said she "missed" Mother, A.T. did not want to return to Mother's custody. Mother frequently was late for supervised visits, but did attend those visits and "appeared to care for" the children. (*Id.*) The GAL recommended that the Agency's temporary custody of D.G. be extended; that Mrs. H be granted temporary custody of A.T.; that Mrs. H's temporary custody of E.G. be extended; and that Father be ordered to have no contact with A.T.

**{¶ 8}** Following a hearing on August 30, 2016, the juvenile court adjudicated A.T. and E.G. dependent and neglected children; adjudicated D.G. a dependent, neglected, and abused child; granted temporary custody of A.T. and E.G. to Mrs. H through July 1, 2017; and granted temporary custody of D.G. to the Agency through July 1, 2017. (Doc. #58.) The court also approved the previously-filed case plan.

**{¶ 9}** A semi-annual review conducted by the Agency in November 2016 reflected that Mother was living with Maternal Grandmother and was engaged to marry a convicted sex offender (not Father). (Doc. #55.) Mother was maintaining "sporadic" contact with the children and was in counseling, but her income was insufficient to meet the children's needs. The review concluded that Mother had made "very little progress" on her case plan. (*Id.*, p. 6.) Father had been investigated for sexual abuse allegations involving A.T. He had participated in some domestic violence classes, but had not followed through on mental health referrals.

**{¶ 10}** A similar review conducted in May 2017 showed that Mother was compliant with mental health services and had completed parenting classes, but continued to lack

independent housing, staying either with her boyfriend (the convicted sex offender) or with Maternal Grandmother. (Doc. #54.) Father was residing with his girlfriend, had no income, had missed multiple parenting classes and had not completed a batterer's program, was "inconsistent with his mental health provider," did not consistently visit his children, and had "voiced the possibility of moving to Oklahoma." (*Id.*, p. 2.) The May 2017 review concluded that a "level of risk" remained as to placing the children with Mother, and that Father had made "marginal progress" toward his case plan objectives. (*Id.*, p. 4.) The Agency recommended that all three children remain in their current placements, but suggested that "a permanency review" might be needed "based on time frames." (*Id.*)

{¶ 11} Thereafter, the Agency filed a motion for a first extension of temporary custody as to D.G. (Doc. #53), as well as motions for first extensions of temporary custody to non-relatives with respect to both E.G. and A.T. (*See id.*, Case Nos. 2016-4188 and 2016-4187, Doc. #47.) All three motions were supported by affidavits attesting that Mother had made "some progress" and/or Father had made "minimal progress" on their respective case plan objectives, but detailing shortfalls that the Agency believed to warrant extensions of the children's existing temporary custody placements. (Doc. #53; Case Nos. 2016-4188 and 2016-4187, Doc. #47.) Following an August 15, 2017 hearing, the juvenile court granted the motions and extended the temporary custody orders as to all three children through December 31, 2017. (Doc. #42.)

{¶ 12} On October 31, 2017, the Agency filed motions, again with supporting affidavits, seeking second extensions of temporary custody as to all three children. The following month, the Agency conducted its semi-annual review. The report of that review chronicled a variety of medical issues afflicting each child, including A.T.'s diagnoses of

post traumatic stress disorder (PTSD) and attention deficit hyperactivity disorder (ADHD) and her hospitalizations due to self harm and flashbacks; E.G.'s diagnoses of celiac[8] disease and "global developmental delays" and his participation in speech, occupational, and physical therapy; and D.G.'s diagnoses of Chiara malformation and developmental delays and his participation in speech, occupational, and physical therapy. (Doc. #39.) The report disclosed that Mother's visits with A.T. had been "suspended" and that Father was "no longer involved" in visits with E.G. and D.G. (*Id.*)[9] Mother continued to have visits with both boys, although D.G. displayed "very flat effect" [sic] during those visits. Mother had no independent housing and worked "only a few hours a week." She recently had completed a parenting psychological assessment, based on which the assigned psychologist "did not support unification." (*Id.*) Father had completed a parenting class and a program for batterers, but he had no known income or stable housing, he had not completed a parenting psychological assessment or anger management, and he was "refusing to take medications." (*Id.*) Father was on probation as a result of "threatening the case worker and the deputy" during a supervised visit, and he had not been in contact with the Agency since.

{¶ 13} The review concluded that the existing placements of all three children remained safe and appropriate. Based on Mother's recent psychological assessment results, the Agency on November 28, 2017 moved for permanent legal custody of D.G.

---

[8] E.G.'s condition was incorrectly identified in this report as "Silica disease." (Doc. #39, p. 2); *but see* Doc. #42, p. 3 ("E.G. has been formally diagnosed with Celiac disease").

[9] The Agency report indicated that Father's visits with E.G. were "on hold" because Father had "missed so many visits." (Doc. #39.) It further related that Father had "acted out" at one visit and "threatened the Case worker and deputy." (*Id.*)

(who remained with the same foster family), and that legal custody of A.T. and E.G. be given to Mr. and Mrs. H, their existing custodians.

{¶ 14} In a report filed on November 29, 2017, the children's GAL described her recent individual visits with each child. (Doc. #37.) A.T. was struggling in school and with "delicate" mental health after revealing incidents of past sexual and psychological abuse. (*Id.*, p. 3.) The GAL reported that A.T. had not seen Mother in over a year based on the recommendation of A.T.'s psychologist, who believed that visits with Mother were triggers for A.T.'s "mental health crises" (i.e., "episodes of hospitalization and/or breakdowns"); such episodes could be triggered by visits or voice communications with Mother, or "even if [A.T.] is only reminded of [Mother] by smell o[r] the mention of her name." (*Id.*)

{¶ 15} The GAL described E.G. as "clean and happy," but "atypical in appearance." (*Id.*) According to the GAL, E.G. was "extremely small for his age and ha[d] not reached many of his age[-]related goals." (*Id.*) E.G. was deemed "likely * * * [to] require special services for the foreseeable future." (*Id.*) D.G. had undergone surgery for Chiari malformation and was progressing well physically, but was at risk for developmental disabilities. The GAL described D.G. as "walking * * *[,] playing * * *[,] well cared for and content." (*Id.*) All three children reportedly were bonded with their caregivers. Both boys continued to have visits with Mother.

{¶ 16} Mother missed her first appointment with the GAL, but did appear for a rescheduled appointment. Mother expressed determination to "fight for all three of her children," and said she believed that her separation from A.T. was not in A.T.'s best interest. Mother had attended medical appointments for and visits with both E.G. and D.G. and asserted that she was "learning to engage" with them. (*Id.*) Mother continued to live

with Maternal Grandmother and work part-time. She had no contact with Father or with A.T.'s father. Mother said she "would have taken action" had she realized that A.T. was being sexually abused. (*Id.*, p. 4.) Mother denied being in a relationship, but said she had a helpful "friend," the man previously identified as her boyfriend and a sex offender. (*Id.*) Mother claimed, however, that the friend's conviction "was a mistake." (*Id.*) She said she would be willing to "remov[e] him from her life" if necessary to reunite with her children. (*Id.*)

{¶ 17} A.T. reportedly told the GAL that she did "not wish to return to the care of her mother" and wished to remain with Mr. and Mrs. H. (*Id.,* p. 5.) The GAL expressed "multiple concerns" about reunifying any of the children with Mother, including a concern that Mother was "cohabitating with a sex offender despite her denial." (*Id.*) Mother told the GAL that she (Mother) would have "no concern leaving the children, including A.T.," in that man's care while Mother was at work. (*Id.*) The GAL also was concerned about Mother's "minimiz[ing] A.T.'s trauma" and Mother's lack of awareness at the time of the alleged abuse. Further, the GAL doubted Mother's ability to consistently schedule and attend the children's necessary appointments. "Most importantly," the GAL doubted Mother's ability to provide adequate parental care for the medical, developmental, and/or mental health issues of all three children.

{¶ 18} The GAL's report subsequently was amended after A.T. again was treated at the emergency room for flashbacks following contact "with Mother and other maternal relatives." (Doc. #26, p. 2.) The GAL opined that "contact with mother is detrimental to [A.T.]'s mental health well-being." (*Id.*)

{¶ 19} The matter was scheduled for a dispositional hearing on January 31, 2018

as to the pending motions for permanent and legal custody. (Doc. #36)

a. *Agency's Evidence*

**{¶ 20}** On January 31, 2018, a juvenile court magistrate held a hearing at which both Mother and Father appeared. D.G.'s foster mother ("Foster Mother") testified that D.G. had been living with her since June 2016, when he was just over one year old. Foster Mother said that when D.G. arrived in her care, he "was covered * * * in bug bites[,][10] * * * had a large burn on his leg[, * * * and had] light bruising sporadically on his body." (Tr., Vol. I, p. 16.) She said he later had "chronic ear infections" and was "sick almost continuously," eventually leading her to take him to an immunology specialist. (*Id.*, p. 21.) Foster Mother said that D.G. had been hospitalized three times for various ailments while in her care. (*Id.*, p. 25.) One of those was for brain surgery in November 2016, to treat Chiari malformation, a condition in which part of D.G.'s brain protruded out of his skull and "down in his neck." (*Id.*, p. 23.) She said that D.G. would need continued monitoring for that condition in order to detect headaches, balance issues, speech impairment, or other altered motor functioning that could be signs of a new problem. (*Id.*, pp. 23-24.)

**{¶ 21}** Foster Mother also expressed concern about D.G.'s "emotional state." (*Id.*, p. 16.) She said that from the time he arrived in her home, D.G. behaved differently than other foster children for whom she had cared. For example, when she tried to put D.G. to sleep, "[h]e just kept waking up and jerking * * *." (*Id.*) She opined that D.G. "didn't [seem to] feel like it was safe to go to sleep." (*Id.*) In addition, "it would take an hour to change his diaper because he would fight so violently"; "[h]e would claw at me. He would kick at

---

[10] Foster Mother indicated that recurring bug bites on D.G. later were diagnosed as scabies. (Tr., Vol I, pp. 18-19.)

me, and he would scratch. He would like be swinging his arms, trying to hit me. * * * [H]e acted like someone who was afraid of everything." (*Id.*, p. 17.) At the time of the hearing, D.G. continued to have behavioral outbursts "[m]ultiple times a week," including hitting adults and other children. (*Id.*, p. 27.) D.G. had begun to see a counselor for help with managing those issues. (*Id.*)

{¶ 22} Foster Mother described developmental delays that affected D.G. When he arrived in her care, "[h]e couldn't sit up yet on his own. * * * He wasn't walking." (*Id.*, p. 16.) He could "kind of" crawl, but not a "normal crawl"; "his balance was really bad," and "he would fall over" when trying to sit up. (*Id.*) At the time of the hearing, D.G. was participating in speech therapy, physical therapy, and occupational therapy, and was "catching up, but * * * still somewhere between six and twelve months behind where he should be for his age." (*Id.*, pp. 19-20.) Foster Mother said that D.G. had been diagnosed with "complex developmental trauma" that contributed to his delays. (*Id.*, pp. 20, 28-29.)

{¶ 23} Foster Mother said that she and her husband were interested in adopting D.G. They had two biological children, one of whom was grown and out of the house, and two other adopted children. (*Id.*, p. 32.) Foster Mother said that D.G. was "really * * * attached" to the other children in the home. She described D.G. as being "like our birth child. * * * We just really love him." (*Id.*, p. 31.)

{¶ 24} Dr. Rhonda Lilley, a clinical psychologist, appeared as the Agency's expert witness. Dr. Lilley testified that she met with Mother on three occasions – on December 22, 2016, with Mother alone, and again in March and June 2017, when D.G. and E.G. also were present with Mother. During the first meeting, Dr. Lilley conducted a clinical interview to learn about Mother's background, "what led her to be involved with Children

Services," "her issues and concerns," and to "explore [Mother's] mental history[,] and * * * strengths and weaknesses as a parent." (*Id.*, pp. 42-43.) Mother also was asked to complete various psychological tests at that time. (*Id.*, p. 43.)

{¶ 25} During the two later visits, Dr. Lilley focused on observing Mother's interactions with D.G. and E.G. She said that the March 2017 visit was "very brief * * * because of the distress of one of the children." (*Id.*) The June 2017 visit then was scheduled to allow Dr. Lilley to witness more interaction with the children. At that time, Dr. Lilley also sought updated information about Mother's employment, housing, and life.

{¶ 26} Dr. Lilley identified a report she prepared based upon her clinical interview with, and her observations and testing of, Mother. (State's Exh. 1.) The report recorded Dr. Lilley's assessment that Mother displayed "excessive" defensiveness, indicative of a person "who tends to deny a lot of responsibility for [her] behavior." (*Id.*, p. 48.) Dr. Lilley said that Mother's "limited insight" into her "dysfunctional" behavior could affect her parenting ability, leaving Mother less likely to "see a reason to change" and "more likely to make decisions that are in [her] own best interest rather than in the interest of [her] children." (*Id.*, pp. 49-50.) Dr. Lilley termed that "a significant concern," manifested through examples such as Mother's blaming A.T. for causing D.G.'s leg burns by placing him in a swing, and Mother's defending Father instead of advocating for A.T. with respect to A.T.'s allegations of sexual abuse. (*Id.*, pp. 50-51.) Dr. Lilley noted that at the time of the interview, Mother was involved with a man who "had a history of sexual abuse of a minor," yet Mother claimed the prior abuse history was not her partner's fault because "the child had lied about her age." (*Id.*, pp. 52-53.) Dr. Lilley expressed concern about Mother's failure to acknowledge the "red flag" indicating that the man posed a potential

risk to her children. (*Id.*, p. 53.) Dr. Lilley said that Mother's pattern with regard to people she brought into her life "creates a high risk factor" as to "providing a safe environment for her children[,] * * * where the child's interest and needs are primary rather than secondary." (*Id.*, p. 53-54.)

{¶ 27} As to the results of the Parenting Stress Index ("PSI") test Mother completed, Dr. Lilley noted that Mother did not identify any life stressors, despite "not having a job," her children being absent from her home, A.T.'s refusal to visit Mother, and D.G.'s having recently been diagnosed with Chiari malformation. (*Id.*, pp. 55-56.) Dr. Lilley stated that Mother's failure to recognize those factors as stressors could indicate a lack of empathy or ability to make accommodations. She said that Mother did report feeling "strongly bonded with her children." (*Id.*, p. 56.)

{¶ 28} Dr. Lilley said that on another psychological test, Mother described "feelings of persecution" related to the custody issues with her children. (*Id.*, p. 59.) Mother "did express regret" about her selection of partners around her children and about having A.T. "assume some of the parenting responsibilities" while A.T. lived with Mother. (*Id.*)

{¶ 29} According to Dr. Lilley, her interview with Mother revealed that Mother "had some very difficult life experiences," including abuse, that "likely have affected her emotional well-being" and her parenting. (*Id.*, p. 60.) Mother reported "a long pattern of * * * living with her mother, trying to live on her own unsuccessfully, and then back living with her mother." (*Id.*, p. 61.) As of June 2017, Mother again was living with Maternal Grandmother. Mother provided no history of long-term stability in housing or employment. Dr. Lilley observed that "it's very hard to provide a stable environment for your children if you don't have a stable residence, if you don't have a stable income from which to support

them. Those are two critical elements in providing a safe and consistent environment" for one's children. (*Id.*) Dr. Lilley concluded that Mother tended "to be dependent upon others," including "considerable dependency" on Father during their relationship, as well as dependency on Maternal Grandmother. (*Id.*, pp. 61-62.)

{¶ 30} Regarding her observations of Mother with D.G. and E.G., Dr. Lilley reported that Mother arrived 30 minutes late for the March 31, 2017 visit. While awaiting Mother's arrival, Dr. Lilley observed E.G. and D.G. engaging in "very positive" interactions with their caregivers. (*Id.*, p. 63.) After Mother arrived, however, E.G., the younger son, was "so distressed" to be separated from his caregiver that Dr. Lilley "terminated the parent/child interaction." (*Id.*, p. 62.)

{¶ 31} During the rescheduled June 23, 2017 visit, Dr. Lilley began with Mother and the caregivers in the same room with E.G. and D.G. When the caregivers left, E.G. "whined a little bit, but * * * did not act distressed." (*Id.*, p. 64.) Dr. Lilley said the boys at first exhibited "no reaction" to Mother's presence; "They didn't run to her. They didn't smile in greeting with her." (*Id.*, p. 66.) E.G. eventually engaged in play with Mother, while D.G. "played more independently;" D.G. "didn't avoid contact" with Mother, but "he didn't actively engage her" in play. (*Id.*, p. 65.) Although Dr. Lilley felt that Mother initially did not react "very proactively," she later "did a good job of getting each one of the kids a toy to play with." (*Id.*) It was Dr. Lilley's understanding that A.T. had refused to participate in the March and June 2017 visits with Mother.

{¶ 32} Based on her observations during the June 2017 visit, Dr. Lilley concluded that Mother "was bonded with her sons, * * * cared very much about them, and * * * wanted to have a relationship with them." (*Id.*, p. 66.) However, E.G. and D.G. "did not

demonstrate a strong attachment or even a strong bond" to Mother. (*Id.*)

{¶ 33} Dr. Lilley diagnosed Mother as having an adjustment disorder with both depression and anxiety, as well as a personality disorder, "undifferentiated with dependency features." (*Id.*, p. 67.) She opined that the combination of those disorders created "significant concerns" regarding Mother's "decision making, problem solving, [and] tendency to make decisions that are in [Mother's] own best interests." (*Id.*, p. 68.) Dr. Lilley stated that such "entrenched" behaviors amount to "risk factors for * * * an environment where the parent's needs may come first rather than the child's, where the parent's need for love and security may come at the expense of the child's needs for safety and security." (*Id.*) She testified that caring for children with special needs "would increase and exacerbate the risk." (*Id.*, p. 70.)

{¶ 34} Dr. Lilley said she hoped that with "adequate treatment," Mother "could overcome some of the problematic aspects of her personality dynamics," but "it is not a short term process." (*Id.*, p. 68-69.) Dr. Lilley opined that such entrenched characteristics "aren't cured in * * * even six months of counseling" (*Id.*, p. 69.) On cross-examination, she termed the prospect of Mother overcoming such issues in five months "[h]ighly unlikely" and "very doubtful." (*Id.*, pp. 70, 71.)

{¶ 35} Also on cross-examination, Dr. Lilley stated that "the issue was never whether [Mother] loved her children or whether she wanted to parent them. The issue was capacity to parent, which is where I found her lacking." (*Id.*, p. 73.) She noted that since A.T.'s birth, Mother

has failed to demonstrate financial stability, interpersonal stability, relationship stability; has consistently made choices that were in the best

interest of herself rather her children. That's a ten-year period. For every ten years of dysfunction, we need almost an equivalent amount of intensive therapy * * * so that we can say this person is not a risk factor for themselves and/or for their children.

(*Id.*, pp. 73-74.)

{¶ 36} On re-direct, Dr. Lilley reiterated that, as a "[g]eneral rule," in order to expect significant progress, "for every year of dysfunction, we want at least a year or two of intensive therapy. Not months or weeks. Years." (*Id.*, p. 76.)

{¶ 37} The Agency's final witness was Cathie Stokes, a child services caseworker who had been involved with Mother and her family "off and on since January 2015." (*Id.*, p. 78.) Stokes said the Agency opened a case in October 2015 after a referral alleged "deplorable conditions in [Mother's] home" and raised concerns about A.T.'s school attendance. (*Id.*) The investigation at that time found Mother's home to be "in pretty poor shape," but not bad enough to warrant A.T.'s removal. (*Id.*, p. 79.) Instead, the Agency developed a case plan "to work with [M]other to address the concerns." (*Id.*) Ultimately, however, the children were removed from the home in June 2016, and had not returned to Mother's care or the care of their respective fathers since.

{¶ 38} Stokes testified that when the children were removed in June 2016, A.T. was placed with a relative, D.G. was placed in foster care, and E.G. was placed with Mrs. H, a non-relative caregiver. In August 2016, after the relative proved unable to pass a home study, A.T.'s placement was changed to the home of Mr. and Mrs. H, where A.T.'s brother E.G. already was living. D.G. had remained in the same foster home since June 2016, and E.G. and A.T. had remained with Mr. and Mrs. H.

{¶ 39} Stokes said that Foster Mother lived in a large home with adequate space for D.G., and that Foster Mother had expressed interest in adopting D.G. Stokes said that from her observations, D.G. appeared to be "[v]ery much" bonded with both Foster Mother and her husband, as well as with their biological and adopted children. (*Id.*, p. 82.) Although Stokes testified that D.G. had special needs, including Chiari malformation and related brain issues, global developmental delays, and complex developmental trauma, Stokes had no concerns about his foster parents' ability to meet those needs. She said D.G. recently had started to see a psychologist.

{¶ 40} Stokes expressed similar confidence in E.G.'s and A.T.'s placement with Mr. and Mrs. H, despite each child's special needs. She said that A.T. had been in counseling one or two times a week for seven months for PTSD and anxiety. Stokes said that, because A.T. "has experienced so much trauma," counselors "are using trauma-focused cognitive behavioral therapy" to help her work through that trauma. (*Id.*, p. 85.) According to Stokes, A.T. had had "multiple emergency room visits" and been hospitalized twice, most recently in the fall of 2017, due to experiencing "flashbacks" where she became "out of touch with reality, [wa]s in danger of hurting herself, bec[a]me aggressive with herself and others." (*Id.*, pp. 84, 86-87.) Stokes said that A.T.'s therapist had recommended that A.T temporarily not have contact with Mother because Mother seemed to be a "trigger" for those flashbacks. (*Id.*, p. 85.) A.T. had begun taking prescribed medication to help address her condition, and "seem[ed] to be doing better." (*Id.*, p. 87.)

{¶ 41} Stokes said that A.T. had "struggled for the past semester" in school due to the consequences of her flashbacks. A.T. was in an online school program and on an IEP

due her special needs. Again, Stokes said that A.T. "seem[ed] to be doing better" on her new medication. (*Id.*, p. 90.) Stokes testified that A.T. also had been referred for genetic testing for "possible genetic issues," and that both A.T. and E.G. were being examined for "possible alcohol-related neuro developmental disorders." (*Id.*, p. 84.)

{¶ 42} Turning to E.G., Stokes testified that he was "in physical, occupational[,] and speech therapy for some global developmental delays." (*Id.*, p. 88.) She said that E.G. also had been diagnosed with celiac disease, hearing issues, weakness on one side of his body, and "vestibular ataxia, where his balance is off." (*Id.*) Stokes said she had no concerns about the ability of Mr. and Mrs. H to meet E.G.'s special needs.

{¶ 43} Stokes stated that the Agency was seeking permanent custody of D.G. She confirmed that the goal of the original case plan developed by the Agency had been reunification of each child with Mother or his or her respective father. (*Id.*, pp. 92-93.) Stokes testified that Mother had agreed to the case plan's objectives for her, including that Mother continue to attend counseling; have a medication evaluation and follow through with any recommendations; complete a parenting and psychological evaluation and follow through with any recommendations; obtain and maintain stable income and housing; complete a parenting education class; sign releases of information to the Agency; visit the children regularly; and attend the children's medical, educational, and mental health appointments, as recommended by the providers. The counseling and medication objections were included because Mother "admitted that she had experienced mental health issues," and later was diagnosed with adjustment disorder. (*Id.*, p. 94.) No medication had been recommended for Mother, and she had been mostly compliant with counseling. (*Id.*, p. 95.)

{¶ 44} Stokes said that the Agency supported Dr. Lilley's recommendations. (*Id.*, pp. 96-97.) Mother had been employed for over eight months in the same part-time job and admitted that her income was not sufficient to provide for the children's needs. According to Stokes, she had been referring Mother for other job opportunities for over a year and a half, "but I don't believe she ever did follow through," except with one call to Goodwill. (*Id.*, p. 99.) Mother previously had one long-term job that she quit due to the length of her commute, but Mother "wasn't getting very many hours" at that job. (*Id.*)

{¶ 45} Stokes said Mother currently reported living "part of the time with [Maternal Grandmother] and part of the time with" a male friend whom Mother previously had identified as a registered sex offender. (*Id.*, pp. 100, 102.) Maternal Grandmother's home was the same home with which the Agency had concerns when the family first was referred. Stokes testified that despite "significant progress" in cleaning up that house, the house was "fairly small" and cluttered, leading to continued concerns about cleanliness, space, and safety, especially for the two younger children. (*Id.*, p. 101.) Although Mother "declined" to allow an Agency home visit to her male friend's home, the Agency had "significant concern" about his conviction, which involved a minor. (*Id.*, pp. 102-103.) Stokes had referred Mother for low-income housing, but Mother had not yet secured independent housing.

{¶ 46} Mother had completed parenting classes and a one-day class "about helping children in times of stress." (*Id.*, p. 105.) Mother also had signed forms to release information to the Agency, attended the children's appointments as recommended by their health care providers, and consistently participated in supervised visitation with E.G. and D.G. Stokes said she had witnessed Mother make progress in her interactions with

her sons. Mother had not seen A.T. in about a year, and Stokes said the Agency supported the recommendations of A.T.'s therapist that no visitation occur. Stokes said A.T. told her "that she doesn't want to visit [Mother], but sometimes she feels like she might want to talk to her." (*Id.*, p. 109.) Going forward, the Agency would recommend visitation between A.T. and Mother as deemed appropriate by A.T.'s therapist. As to E.G., Stokes said the Agency believed future visitation with Mother should be supervised due to E.G.'s "special dietary restrictions" and developmental delays. (*Id.*)

{¶ 47} Turning to Father, Stokes testified that his original case plan was amended after he was convicted of menacing for threatening Stokes both at the Agency and during an August 2017 visit with D.G. She said that when Father learned that E.G. was absent from that visit due to illness, Father "became very agitated" and "began using vulgar and obscene language in a very loud manner." (*Id.*, p. 114.) Father's "verbally aggressive" behavior continued after several warnings to calm down due to the presence of other children and families. (*Id.*, pp. 114-115.) When Stokes attempted to take D.G. from the room for his safety, Father "threatened to harm me by punching me. * * * He threatened me several times." (*Id.*, p. 115.) As a result, anger management classes were added to Father's case plan. Stokes said she orally notified Father that such an addition would be made, but that a copy of the amended plan mailed to Father's address was returned.

{¶ 48} According to Stokes, Father had been "inconsistent" with visitations even before that incident. (*Id.*, p. 130.) She said E.G. and D.G. seemed to be "very uncomfortable and distressed" at the beginning of the visits they did have with Father. (*Id.*, p. 131.) She credited Father for trying to engage the boys with toys, but she said that the boys remained "very reserved" with him, and preferred to stay near her.

{¶ 49} As to Father's case plan objectives, Stokes testified that Father had refused to sign releases, but had submitted written verification of his completion of a parenting class and a domestic violence class. Stokes had been unable to contact Father since September 2017 and did not know if he had completed anger management. She said that since their last contact, letters mailed to two different addresses for Father had been returned, and the return on an attempt at personal service indicated that Father did not live at the most recent address the Agency had for him. Stokes had not been to that address because she was advised not to complete home visits with Father after the menacing charge. Father remained on probation, but Stokes believed that he had been compliant with regard to criminal court proceedings. Stokes had no verification of Father's having completed a mental health assessment in accordance with the case plan, of his compliance with receiving mental health services, or of his completion of a parenting and psychological evaluation. She also had no verification of Father's employment or income, or of his having acquired independent housing.

{¶ 50} Asked about alternative placements, Stokes said that Mother had suggested her niece as a possible caregiver for D.G., but the Agency was concerned about the niece's ability to manage D.G.'s special needs. Further, it was unknown whether Mother's niece could pass a home study, and Stokes said D.G. did not have a strong bond with Mother's niece prior to his current placement. Due to D.G.'s "attachment issues," Stokes expressed reluctance to place D.G. with someone with whom he currently had "no relationship." (*Id.*, p. 131.) The Agency was not aware of other placement options and recommended that D.G "remain where he is," with permanent custody of D.G. being granted to the Agency. (*Id.*, pp. 134-135.) Similarly, Stokes recommended that legal

custody of A.T. and E.G. be granted to Mr. and Mrs. H. Stokes opined that the children's best interest would be served by those placements, where "they are having all of their basic and special needs met." (*Id.*, p. 135.)

{¶ 51} On cross-examination, Stokes denied that she had received messages from Father or had any other contact with him since September 2017.

*b. Father's Evidence*

{¶ 52} When the hearing continued on February 22, 2018, Father testified that he was working part-time at a sandwich shop. In the preceding year, he had worked in a series of jobs, each for a month or more. He did not have independent housing, but was "staying with friends" while waiting for a house to "open[ ] up." (Trial Tr., Vol. II, p. 7.) Father said he was "in [the] process of doing a full psych evaluation" and had completed an anger management class, but he had not completed a parenting and psychological examination. (*Id.*, pp. 7-8.) Father was nearing completion of his probation. He said he had not attended appointments for D.G. and E.G., and had not had visitation with them since August 2017, because he had not been informed of opportunities to do so. He said he had left messages for Stokes and was waiting for her to return his calls.

{¶ 53} Father said he would like to have E.G. removed from the custody of Mr. and Mrs. H and placed in the Agency's custody, and he would like to have D.G. also removed from his existing placement, so that the brothers could be placed together. Father said he was "not being told [by Mrs. H] about anything that's going on," and that he was not permitted to be with E.G. if A.T. also would be there. (*Id.*, p. 11.) Father blamed Stokes for his failure to have completed his remaining case plan objectives. He provided examples of ways in which Stokes allegedly had treated Mother more favorably than

Father during the Agency's involvement.

{¶ 54} On cross-examination, Father denied that another organization had tried to contact him to arrange visits with his sons outside the Agency. He said he had been unable to comply with visitation because he "d[id]n't know what's going on." (*Id.*, p. 15.) Father said his current part-time job paid about $7.00 per hour, plus tips. He said he had been terminated from one job in 2017 due to an injury and left another job due to illness, but he was unable to provide documentation of his income and employment history. (*Id.*, p. 18.) Father stated "it's probably been six or seven years" since he had his "own place"; "[one] can't really, you know, settle down and have a place if * * * every two or three weeks you're moving to a different place just so you can experience life and learn * * * things." (*Id.*, p. 21.)

{¶ 55} Father said he had tried "on several occasions" to contact Stokes, but she never returned his calls. (*Id.*, p. 19.) He said his telephone number had been unchanged for over a year and that Stokes had that number. He also indicated that two telephone numbers the GAL had for him were not familiar; "I mean, [they] might have been one of my friend's numbers that I may have given as an * * * extra contact, but * * * neither one of those have [sic] ever been my phone number." (*Id.*, pp. 40-41.)

{¶ 56} Father again said that he was "in [the] process" of obtaining a psychological evaluation, but he had not provided any documentation to the Agency. (*Id.*, pp. 22-23.) He said he had provided documentation as to the mental health services he was receiving. Father admitted to having threatened to knock Stokes unconscious,[11] and to

---

[11] Stokes later was re-called to rebut Father's version of that incident. (*See* Trial Tr., Vol. 2, pp. 41-44, 49-53.)

having had a protective order in 2013 as to a different Agency caseworker. He said he had completed a one-day anger management class in January 2018, but had not provided documentation to the Agency.

{¶ 57} Father acknowledged that both E.G. and D.G. had special needs, but said he did not know what those special needs were; "I've never been told." (*Id.*, p. 36.) Because Mrs. H once was "extremely upset" when Father gave E.G. one of D.G.'s bottles during a visit, Father was aware that E.G. "is on a special diet." (*Id.*, pp. 36-37.) Having heard the testimony of D.G.'s Foster Mother regarding D.G.'s special needs, Father said he "would do pretty much the same thing she was doing" in terms of taking D.G. to appointments or to the hospital for an emergency. Father said he was trying to obtain another job so he could afford a car. He indicated his belief that he could meet all of D.G.'s needs if he were made aware of them.

{¶ 58} Mother presented no hearing testimony. The magistrate asked to hear from the children's GAL, who recommended that all three children remain in their existing placements. The magistrate took the matter under advisement, but asked Mr. and Mrs. H, who were present for the hearing, to sign paperwork affirming their willingness to assume legal custody of A.T. and E.G. if that were to be the decision.

*c. Decision*

{¶ 59} On March 8, 2018, the magistrate issued a decision granting permanent custody of D.G. to the Agency. (Doc. #25.) In the same filing, the juvenile court adopted the magistrate's decision and advised the parties of their time to file objections. (*Id.*, p. 9.) On the same date, the magistrate and the court entered similar decisions granting Mr. and Mrs. H legal custody of both A.T. and E.G. (Case No. 2016-4188, Doc. #22.)

{¶ 60} Father and Mother filed separate objections to the custody decisions, and also requested extensions of time to file supplemental objections after they had received and reviewed transcripts of the hearing testimony. The Agency, too, requested additional time to reply to the parents' objections after reviewing the hearing transcripts. Two volumes of transcripts were filed on October 3, 2018; supplemental objections were filed thereafter.

{¶ 61} On March 12, 2019, the juvenile court issued a final decision that overruled Mother's and Father's separate objections to the magistrate decision; granted permanent custody of D.G. to the Agency, and granted legal custody of A.T. and E.G. to Mr. and Mrs. H. Mother was granted parenting time with A.T. as approved by A.T.'s therapist, and monitored visitation with E.G. "as approved by the parties." Father was granted supervised parenting time with E.G.

*d. Appeals*

{¶ 62} Separately, both Mother and Father appeal from the trial court's judgments. Father sets forth two assignments of error:

1) The trial court erred in finding that clear and convincing evidence was presented showing that permanent custody of D.G. to [the Agency] was in the best interest of the child.

2) The trial court erred in granting legal custody of E.G. to non-relative caregivers.

{¶ 63} Mother's appeal advances three assignments of error:

1) Mother received ineffective assistance of counsel due to their [sic] failure to object to hearsay testimony in a permanent custody trial, and the trial

court erred in considering that evidence.

2) [The Agency] failed to make reasonable efforts to reunify children and Mother prior to the permanent and legal custody motions.

3) The trial court erred in finding there was clear and convincing evidence that permanent custody to [the Agency] is in the best interest of D.G., and in finding that a preponderance of the evidence existed for an award of legal custody of A.T. and E.G.

{¶ 64} Those appeals were consolidated before this Court. We will address the issues in the order most conducive to our analysis.

### Standard of Review

{¶ 65} An appellate court will not reverse an award of legal or permanent custody of a child absent an abuse of discretion by the juvenile court. *See In re M.O.*, 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7 (applying abuse of discretion standard to award of legal custody); *In re K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, ¶ 15 (2d Dist.) (applying abuse of discretion standard to decision granting permanent custody and terminating parental rights).The term "abuse of discretion" implies that the court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 66} If the juvenile court's decision as to a child's best interest is not supported by competent, credible evidence, that decision is unreasonable, and we may reverse. *In re Starks,* 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 17, citing *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001). However, "the discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature

of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.*

### Mother's 1st Assignment of Error - Ineffective Assistance of Counsel

**{¶ 67}** In her first assignment of error, Mother contends that she was denied the effective assistance of counsel by her trial attorney's failure to object to hearsay evidence introduced through the testimony of D.G.'s foster mother. Mother argues that Foster Mother's testimony "tainted" the permanent custody proceeding (Brief of Appellant, Mother, p. 13), in part by suggesting that Mother may have caused D.G.'s special needs. Mother also faults her trial attorney for failing to "present any evidence to contradict [Foster Mother's] testimony," or to "question" that witness. (*Id.*, p. 12.)

**{¶ 68}** The constitutional right to the effective assistance of counsel generally does not attach in civil actions. *D.O.I.T., L.L.C. v. Bd. of Wright Dunbar Technology Academy*, 2d Dist. Montgomery No. 23250, 2011-Ohio-4538, ¶ 5, citing *Wolford v. Wolford,* 184 Ohio App.3d 363, 2009-Ohio-5459, 920 N.E.2d 1052, ¶ 32 (4th Dist.) (" 'A complaint of ineffective assistance of counsel is not a proper ground on which to reverse the judgment of a lower court in a civil case that does not result in incarceration * * * ' "); *Phillis v. Phillis,* 164 Ohio App.3d 364, 2005-Ohio-6200, 842 N.E.2d 555, ¶ 53 (5th Dist.); *Novello v. Novello,* 7th Dist. Noble No. 10 NO 378, 2011-Ohio-2973, ¶ 23 ("The Sixth Amendment guarantees a defendant effective counsel in criminal prosecutions. There is no such

guarantee in civil actions."). However, given that "the permanent termination of parental rights has been described as 'the family law equivalent of the death penalty,' " parents are entitled to the effective assistance of counsel in permanent custody actions. *In re S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, ¶ 7-8, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997).

{¶ 69} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel also is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

{¶ 70} The record does not support a conclusion that Mother's trial attorney provided constitutionally deficient representation. Mother identifies no evidence that her attorney purportedly could have presented that would have countered Foster Mother's testimony about D.G.'s special needs. Notably, Mother does not contend that D.G. does not experience the medical, psychological and/or developmental challenges about which Foster Mother testified. Further, although the juvenile court did refer to a portion of Foster

Mother's testimony in its final decision, including her testimony about D.G.'s diagnosis with and surgery for Chiari malformation (Judge's Final Appealable Order, pp. 5-6), the trial court did *not* intimate that Mother was responsible for causing D.G.'s special needs or that any such supposition was a basis for its decision. When a matter is tried to a judge without a jury, we presume that the court considered only proper evidence in reaching its decision, unless the record indicates otherwise. *See Brunett v. Brunett*, 2d Dist. Clark No. 2016-CA-14, 2017-Ohio-307, ¶ 19, citing *In re C.C.*, 2d Dist. Montgomery No. 26864, 2016-Ohio-1417, ¶ 26; *Mason v. Swartz*, 76 Ohio App.3d 43, 55, 600 N.E.2d 1121 (6th Dist.1991). Here, even if the hearsay evidence Mother identifies were objectionable, the admission of that evidence "was harmless beyond a reasonable doubt." *See In re C.C.* at ¶ 26.

{¶ 71} Mother's first assignment of error is overruled.

**Mother's 2nd Assignment of Error – Deficient Reunification Efforts**

{¶ 72} Mother next argues that the Agency did not undertake reasonable efforts to reunify her with her children. She claims the evidence demonstrates that she achieved most of her case plan objectives, and she faults the Agency for seeking legal and permanent custody determinations before allowing Mother sufficient time to undergo "the sort of counseling Dr. Lilley recommended." (Brief of Appellant, Mother, pp. 14-15.) That assignment of error is not well taken.

{¶ 73} The Supreme Court of Ohio has held that, "except for a few narrowly defined exceptions, the state must have made reasonable efforts to reunify the family prior to the termination of parental rights." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 21. "If the agency has not established that reasonable efforts have been made

prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

**{¶ 74}** " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need * * * as a predicate to reunification.' " *In re N.M.*, 2d Dist. Montgomery No. 26693, 2016-Ohio-318, ¶ 53, quoting *In re H.M.K.,* 3d Dist. Wyandot Nos. 16-12-15, 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.,* 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Id.*, quoting *In re K.M.,* 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23.

**{¶ 75}** In this case, the record demonstrates that the Agency did make reasonable efforts to reunify the family prior to moving for permanent custody of D.G. On the date of the permanent custody motion, D.G. had been living with Foster Mother for about 18 consecutive months. Throughout that time, the Agency accommodated Mother's visits with her children, assisted her in finding a parenting education class, directed her to a psychologist for a recommended parenting and psychological assessment, and monitored and encouraged Mother's compliance with her mental health counseling appointments. The Agency also provided Mother with multiple referrals for employment and housing opportunities. Despite those referrals, Mother had not acquired full-time employment, nor had she secured an independent living situation. Rather, she continued to live in Maternal Grandmother's home that the Agency previously had determined to be too small and cluttered to provide a safe, appropriate environment for her children.

Additionally, Mother acknowledged that her part-time employment did not generate enough income to meet the children's financial needs.

{¶ 76} Further, Mother continued to maintain some form of ongoing close relationship with a former boyfriend with whom Mother at times had lived and who had been convicted of a sex offense involving a minor. Although Mother once expressed a willingness to end that friendship if necessary in order to regain custody of her children, Mother also had told the children's GAL that Mother would have "no concern leaving the children, including A.T.," in that man's care while Mother was at work. (Doc. #37, p. 5.) The potential risk posed to the children by Mother's continued association with that friend was not the product of any failure in the Agency's reunification efforts. In more than one instance where a mother failed to complete her established case plan objectives, this court has determined that "it was [the mother], not [the children's services agency], who failed to make reasonable efforts" to facilitate family reunification. *See In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 42; *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 25. In the latter case, our conclusion was based in part on the mother's ongoing relationship with a sex offender. *In re A.W.* at ¶ 25. The record supports a similar conclusion in this case.

{¶ 77} Additionally, and perhaps most significantly, Dr. Lilley's assessment of Mother's parenting and psychological test results revealed that Mother suffered from psychological conditions likely to continue to impair her ability to safely and effectively parent her children. (*See* Trial Tr., Vol. I, p. 67.) Dr. Lilley conveyed "significant concerns" that Mother's "entrenched" behaviors created "an environment where [Mother]'s needs may come first rather than the child[ren]'s" and her "need for love and security may come

at the expense of the child[ren]'s needs for safety and security." (*Id.*) Dr. Lilley testified that the risk posed to the children would be "increase[d] and exacerbate[d]" due to the children's special needs. (*Id.*, p. 70.) Further noting that Mother had exhibited a pattern of dysfunctional behavior for a period of at least 10 years, Dr. Lilley opined:

> For every ten years of dysfunction, we need almost an equivalent amount of intensive therapy * * * so that we can say this person is not a risk factor for themselves and/or for their children.
>
> * * *
>
> * * * [F]or every year of dysfunction, we want at least a year or two of intensive therapy. Not months or weeks. Years."

(Trial Tr., Vol. I, pp. 73-74, 76.)

{¶ 78} The Agency cannot be said to have failed to undertake reasonable efforts at reunification simply because it did not choose to await the 10-to-20 years of intensive therapy that Dr. Lilley recommended as necessary before the children potentially could be returned safely to Mother's care. We have held that a juvenile court does not err by awarding permanent custody to a non-parent where the record does not demonstrate that an additional extension of temporary custody would have enabled the parent to complete his or her case plan objectives. *See In re E.K.*, 2d Dist. Montgomery No. 26897, 2016-Ohio-5052, ¶ 8-14. Based on Dr. Lilley's testimony, the record does not support a conclusion that extending temporary custody of any of the three children would have enabled Mother to assume custody of D.G., A.T. or E.G. within a reasonable time.

{¶ 79} Mother's second assignment of error is overruled.

**Father's 1st/Mother's 3rd Assignment of Error - Permanent Custody of D.G.**

{¶ 80} Both Mother and Father contend that the juvenile court erred in awarding permanent custody of D.G. to the Agency. They argue that clear and convincing evidence did not support the court's determination that a permanent custody award was in D.G.'s best interest. Mother additionally suggests that "the trial court's decision was against the manifest weight of the evidence." (Brief of Appellant, Mother, p. 16.) The record does not bear out their contentions.

### a. Law Governing Permanent Custody Determinations

{¶ 81} The United States Supreme Court has stated that a parent's interest in the care, custody, and control of his or her children "is perhaps the oldest of the fundamental liberty interests recognized by" that court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Unless they forfeit the right through specific conduct, "suitable" parents have a "paramount" right to the custody of their minor children. *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). Still, "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." (Citation omitted.) *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 82} Pursuant to R.C. 2151.414(B)(1)(d), if a child has been in the temporary custody of a children services agency for 12 or more months of a consecutive 22-month period, the juvenile court may grant permanent custody of that child to the agency upon a determination that permanent custody is in the child's best interest. Because an award of permanent custody is " 'a drastic remedy' " that "involves the termination of parental rights," permanent custody determinations must be based upon clear and convincing evidence. *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4, fn.1, quoting

*In re A.W.,* 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6; *see also* R.C. 2151.414(B)(1) and (E). "Clear and convincing evidence" is " 'the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.' " *In re Rose,* 2017-Ohio-694, 85 N.E.3d 498, ¶ 19 (2d Dist.), quoting *In re Estate of Haynes,* 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). "Clear and convincing" means "more than a mere preponderance," but less than "clear and unequivocal." *Id.*

In determining a child's "best interest" under R.C. 2151.414(B)(1), a court must consider the factors set forth at R.C. 2151.414(D)(1). Those factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of [an agency] * * * for twelve or more months of a consecutive twenty-two-month period* * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) [Whether additional factors listed at R.C. 2151.414(E)(7)-(11) apply].

R.C. 2151.414(D)(1).

*b. Analysis*

**{¶ 83}** Father and Mother both admit that, in accordance with R.C. 2151.414(B)(1)(d), D.G. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period before the Agency filed for permanent custody. As a result, the juvenile court was empowered to grant permanent custody of D.G. to the Agency based on "clear and convincing evidence" that D.G.'s best interest would be served by such an award. *See id.* In determining D.G.'s best interest, the court properly considered the relevant factors enumerated at R.C. 2151.414(D)(1). Further, the record demonstrates that clear and convincing evidence supports the juvenile court's determination that an award of permanent custody to the Agency was in D.G.'s best interest, and the court's decision was not against the manifest weight of the evidence.

*R.C. 2151.414(D)(1)(a) –interaction/interrelationship of child with others*

**{¶ 84}** The juvenile court determined that evidence of D.G.'s close connection to his foster family weighed in favor of his remaining in that placement. The court cited both the caseworker's observations about D.G.'s bond with his entire foster family and Foster Mother's testimony that she viewed D.G. "like our birth child."

**{¶ 85}** In contrast, the evidence indicated that D.G. had not demonstrated a bond to Father. Father's protracted absence from visitations with D.G., along with testimony regarding D.G.'s "attachment" issues, was evidence tending to further support a conclusion that a close relationship did not exist between the two. While Mother was consistent with visitation and did appear to be genuinely bonded to her son, the juvenile court did not err by failing to conclude that such relationship outweighed D.G.'s interest in retaining his bond with his long-time foster family.

**{¶ 86}** Although Mother contends that "the only evidence regarding D.G.'s

interactions was found in * * * inadmissible hearsay," the record belies that claim. Cathie Stokes testified to her personal observations of D.G.'s positive interactions with Foster Mother, her husband, and the rest of D.G.'s foster family. (Trial Tr., Vol. 1, pp. 81-83.) Similarly, Foster Mother testified about her personal attachment to D.G. and her observations of his interactions with her entire family. Credible, competent, clear and convincing evidence supported the juvenile court's assessment regarding this factor.

*R.C. 2151.414(D)(1)(b) –child's wishes*

{¶ 87} Given that D.G. was less than three years old at the time of the permanent custody hearing, he was too young to express his wishes in accordance with R.C. 2151.414(D)(1)(b). The court properly so found. This factor had no bearing on the court's decision.

*R.C. 2151.414(D)(1)(c) –child's custodial history*

{¶ 88} The lengthy duration of D.G.'s placement with his foster family was a factor that, while not dispositive in isolation, weighed in favor of permanent custody under R.C. 2151.414(D)(1)(c). D.G. was 13 months old when he was removed from Mother's custody in June 2016; by the date of the court's original permanent custody decision in March 2018, D.G. had spent nearly two-thirds of his life in the sole custody of his foster family. The court's assessment of that factor was supported by clear and convincing evidence.

*R.C. 2151.414(D)(1)(d) –child's need for secure permanent placement*

{¶ 89} The juvenile court placed great emphasis on D.G.'s need for "a legally secure permanent placement" and on the court's perception that neither Father nor Mother was able to provide a home environment consistent with that goal, whereas D.G.'s foster family was. Clear and convincing evidence of D.G.'s multiple medical, emotional,

and developmental challenges, and of Father's and Mother's ongoing lack of adequate and stable employment and housing, as well as their own mental health challenges, supported the court's determination.

{¶ 90} The court summarized Foster Mother's testimony about the many physical and emotional problems that affected D.G. when he first came into her care, as well as her testimony about numerous additional problems that had surfaced throughout D.G.'s time in her home. Among those were D.G.'s brain surgery in November 2016 to treat Chiari malformation, and multiple other hospitalizations during 2016. The court noted Foster Mother's statement that D.G. saw a doctor for illness up to 10 times per month, and her description of regular "behavioral outbursts" where D.G. would hit other children and adults or "target" other children at daycare. The court noted that D.G. was in "intensive psychotherapy" as well as speech, physical, and occupational therapy for developmental delays and emotional issues expected to cause ongoing academic and other concerns.

{¶ 91} The juvenile court noted that reunification of D.G. with either Mother or Father was the initial goal of the original case plan, but nonetheless found that an award of permanent custody to the Agency was in D.G.'s best interest. On that point, the court stated:

Neither parent has made significant progress on [his or her] case plan objectives. [D.G.] is in need of a legal secure permanent placement and is currently placed in a foster-to-adopt home. [D.G.] is bonded with his current foster family. * * * Placement with either Mother or * * * [F]ather is not possible within a reasonable time due to their failure to remedy problems that initially

caused the children to be placed outside the home.

> * * * The Court finds there are no other willing or able relatives for placement for [D.G.]. Mother sent information to the Agency about a niece the day before the hearing. The Agency did not have an opportunity to explore that option. The Agency would be concerned with that placement due to [D.G.]'s special needs, as well as his attachment issues and not having a relationship with the niece. The caseworker noted that [D.G.] may have had occasional visits with this individual, but was unaware of a bonded relationship. The caseworker did meet the niece at the beginning of the case, but has not had an opportunity to vet her.

> The Agency is unaware of any other potential placements. [D.G.] is adoptable. [D.G.]'s current foster family has been identified as a potential adoptive placement. If permanent custody were granted, the case would be transferred to an adoptions unit where a matching conference would be held with the [foster parents] since they expressed an interest in adopting.

(Citations omitted.) (Judge's Final Appealable Order, pp. 20-21.)

**{¶ 92}** Mother has not disputed any particular factual finding made by the court as to this factor. Although she does assert that she "could have provided a permanent placement" for D.G. and that Dr. Lilley's opinion about needed treatment was "[t]he only barrier" to that result, clear and convincing evidence supports the juvenile court's conclusion that Mother still lacked suitable housing, sufficient income, and the ability to reliably meet D.G.'s substantial medical and other needs that his foster family had been managing well.

{¶ 93} In contrast, Father asserts that "no evidence * * * establish[es] that [he] was in any way responsible for the situation that initially led to the children's removal from their mother's care." Irrespective of that assertion, it also is true that Father has directed us to no evidence in the record that undermines the court's conclusion that assigning permanent custody to the Agency was in D.G.'s best interest. Although Father alleges that any lack of progress on his case plan stemmed from his "contentious relationship" with the Agency, the juvenile court was entitled to reject that explanation as lacking credibility, and/or to determine that Father alone was responsible for any "contentious relationship." Furthermore, Father's hearing testimony did not evince a present ability to provide an appropriate and secure placement for D.G. In fact, Father at that time stated not that he wished to gain custody of D.G., but only that he wished D.G. to be removed from D.G.'s current foster home, with no suggestion for an alternate placement.

{¶ 94} Given the extensive evidence of Father's demonstrated pattern of "aggressive tendencies," long-term lack of stable employment and housing, failure to diligently pursue his case plan objectives, and history of repeated missed visitation, the juvenile court did not err by concluding that clear and convincing evidence demonstrated that D.G.'s best interest under R.C. 2151.414(D)(1)(d) weighed in favor of an award of permanent custody to the Agency.

*R.C. 2151.414(D)(1)(e) –other factors*

{¶ 95} Finally, under R.C. 2151.414(D)(1)(e), the juvenile court determined that the additional factor listed under R.C. 2151.414(E)(10) applied with regard to Father, whom the court found had "abandoned" D.G. by failing to visit or contact the child for a period of

more than 90 days. (Judge's Final Appealable Order, p. 17, citing R.C. 2151.011(C)).[12] Again, clear and convincing evidence supports the juvenile court's conclusion. Father admitted that he had not visited either D.G. or E.G. since August 2017. Although Father attempted to blame the missed visits on the Agency's failure to communicate with him, we must defer to the juvenile court's apparent determination that Father's explanation was not credible.

{¶ 96} Based on the record, we conclude that clear and convincing evidence supported the juvenile court's determination that D.G.'s best interest warrants his placement in the Agency's permanent custody.

*Manifest Weight of the Evidence*

{¶ 97} Finally, contrary to Mother's suggestion, the trial court's conclusion regarding D.G.'s best interest was not against the manifest weight of the evidence. A trial court's permanent custody decision " 'will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.' " *In re S.J.*, 2d Dist. Montgomery No. 25551, 2013-Ohio-3653, ¶ 27, quoting *In re A.U.,* 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. " '[I]issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.' " *Id.*, quoting *In re A.J.S.,* 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22. For the reasons discussed above, we conclude that competent, credible evidence supported the juvenile court's

---

[12] That section states in part: "For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days * * *."

conclusions.

**{¶ 98}** Father's first assignment of error is overruled, and Mother's third assignment of error is overruled as to the juvenile court's permanent custody decision regarding D.G.

### Father's 2nd/Mother's 3rd Assignment of Error - Legal Custody of E.G.

**{¶ 99}** Father and Mother advance similar separate challenges to the juvenile court's award of legal custody of E.G. to his non-relative caregivers, Mr. and Mrs. H. Father argues that the court's decision was "unreasonable" given Father's "significant progress on his case plan," while Mother faults the court for relying on Dr. Lilley's psychological assessment of Mother's parenting abilities. Neither argument is well taken.

*a. Law Governing Legal Custody Awards*

**{¶ 100}** A juvenile court may award legal custody of a dependent child to a parent or to any other person who is proposed as a legal custodian. *In re A.F.*, 2018-Ohio-310, 103 N.E.3d 1260, ¶ 51 (2d Dist.), citing R.C. 2151.353(A)(3). When making a legal custody determination under R.C. 2151.353, the juvenile court must apply the "best interest of the child" standard set forth at R.C. 3109.04(F)(1). *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589 (1992), paragraph two of the syllabus; *see also* R.C. 2151.23(F)(1) (requiring juvenile court to exercise its jurisdiction in child custody matters in accordance with R.C. 3109.04 and other code sections); *In re R.H.B.*, 2d Dist. Clark Nos. 2015-CA-12, 2015-CA-14, 2016-Ohio-729, ¶ 2 ("the best interest of the child is the court's primary consideration" in awarding legal custody).

**{¶ 101}** Under R.C. 3109.04(F)(1), the factors a court must consider in determining a child's best interest include the parents' wishes; the child's wishes, if expressed to the

court during an interview; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; the child's adjustment to his or her home, school, and community; and the mental and physical health of all persons involved. *In re D.S.*, 2d Dist. Clark No. 2013 CA 51, 2014-Ohio-2444, ¶ 9. "[B]lood relationship" and "family unity" may be relevant, but are not controlling. *Id.*

{¶ 102} An award of legal custody must be based on a preponderance of the evidence. *In re A.F.* at ¶ 53. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *Id.*, quoting *In re Starks,* 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, and *Black's Law Dictionary* 1182 (6th Ed. 1998).

*b. Analysis*

{¶ 103} Although "[a] parent's case-plan compliance is relevant * * * to the best-interest determination, * * * it is not dispositive." *In re A.K.*, 2d Dist. Montgomery No. 27575, 2017-Ohio-8100, ¶ 11, citing *In re T.S.*, 2017-Ohio-482, 85 N.E.3d 225, ¶ 13 (2d Dist.). "The statutory best-interest factors may justify an award of legal custody to someone other than a parent, or even the termination of parental rights, despite a parent's completion of all case-plan objectives." *Id.*, citing *In re T.S.* at ¶ 12. Thus, irrespective of either parent's progress on his or her case plan objectives here, the juvenile court was not precluded from awarding legal custody of E.G. to someone other than Mother or Father. Additionally, the record supports the juvenile court's conclusion that Father had *not* substantially complied with his case plan objectives.

{¶ 104} In deciding the Agency's motion for an award of legal custody of E.G., the juvenile court properly analyzed the "best interest" factors set forth at R.C. 3109.04(F)(1).

A preponderance of the evidence supported the court's conclusion that E.G.'s best interest warranted awarding legal custody to his existing caregivers, Mr. and Mrs. H. Because E.G. was only 19 months old at the time of the custody hearing, he was unable to express his own wishes as to his future placement. The factor under R.C. 3109.04(F)(1)(b) therefore had no bearing on the court's decision. Similarly, the factors listed under R.C. 3109.04(F)(1)(f)-(j), most of which relate to custody disputes between parents, were not relevant as to the court's decision in this case.

{¶ 105} As to R.C. 3109.04(F)(1)(c), the record contains, and the court considered, significant evidence regarding E.G.'s interactions with his parents, siblings, and foster family. Caseworker Stokes testified that she personally had observed E.G.'s bond with and positive response to the care provided by Mr. and Mrs. H, in whose home E.G.'s sister, A.T., also lived. In contrast, E.G. had experienced only sporadic interaction with Father, and none since August 2017. Although E.G.'s interactions with Mother were positive and more regular, a preponderance of the evidence supported a conclusion that the R.C. 3109.04(F)(1)(c) factor weighed in favor of legal custody to Mr. and Mrs. H.

{¶ 106} E.G. was too young to attend school, but the evidence showed that he had adjusted well to Mr. and Mrs. H's home, despite multiple medical and developmental challenges. The family was managing E.G.'s celiac disease with a special diet and had enrolled him in physical, occupational, and speech therapy to address various health concerns. Father testified that he was aware that E.G. had special needs, but not familiar with their implications. He knew that E.G. was on a restricted diet only because he once had given E.G. a bottle (belonging to D.G.) that contained formula E.G. was not supposed to consume. Although Father expressed a willingness to take E.G. to appointments, he

had not attended any such appointments in the past, and he did not own a car. Mother had attended some medical appointments for E.G. and was more familiar with his care. Still, a preponderance of the evidence supported a determination that E.G.'s best interest as measured under R.C. 3109.04(F)(1)(d) and (e) favored a grant of legal custody to Mr. and Mrs. H.

{¶ 107} Only as to the one remaining factor - R.C. 3109.04(F)(1)(a), regarding the parents' wishes – could a preponderance of the evidence be said to weigh against an award of legal custody to Mr. and Mrs. H. Even as to that factor, Father's wish as stated at the hearing was not that Father receive custody of E.G., but rather that custody be awarded to the Agency. (*See* Trial Tr., Vol. II, p. 11.) The court did not err by concluding that a preponderance of the evidence did not support an effectuation of Father's stated preference. Further, in conducting a best interest analysis, "the focus * * * is on the child, not the parent." *In re A.K.*, 2d Dist. Montgomery No. 27575, 2017-Ohio-8100, at ¶ 11. Despite Mother's wish to have E.G. returned to her custody, a preponderance of the evidence supported the juvenile court's conclusion that E.G.'s best interest warranted an award of legal custody to Mr. and Mrs. H, who had been fulfilling E.G.'s needs since June 2016 and who seemed best positioned to serve his future needs.

{¶ 108} For the foregoing reasons, Father's second assignment of error is overruled, and Mother's third assignment of error is overruled as to the juvenile court's award of legal custody of E.G. to Mr. and Mrs. H.

### Mother's 3rd Assignment of Error – Legal Custody of A.T.

{¶ 109} Finally, Mother alone challenges the juvenile court's award of legal custody of A.T. to Mr. and Mrs. H. Our review confirms that the trial court considered the proper

factors in determining A.T.'s best interest in accordance with R.C. 3109.04(F)(1), and further confirms that a preponderance of evidence supported the trial court's determination that an award of legal custody of A.T. to Mr. and Mrs. H was in A.T.'s best interest.

{¶ 110} The record reflects that the trial court appropriately considered the testimony regarding A.T.'s desire, as expressed to the court-appointed GAL, to remain in the care and custody of Mr. and Mrs. H. *See* R.C. 3109.04(F)(1)(b). A.T. was 12 years old at the time of the legal custody decision, and the GAL viewed A.T. as mature enough to reach an informed opinion regarding her preferences. Further, the court properly considered the reported opinion of A.T.'s therapist that A.T. should not be in Mother's presence for the sake of A.T.'s mental health. *See* R.C. 3109.04(F)(1)(e). Undisputed evidence indicated that A.T. suffered from PTSD and anxiety as a result of trauma she suffered while in Mother's custody, leading to "multiple emergency room visits" and two hospitalizations when A.T. experienced "flashbacks" where she was in danger of hurting herself and others. (Trial Tr., pp. 84, 86-87.) A.T.'s therapist was said to have opined that Mother was a "trigger" for A.T.'s mental health crises. (*Id.*, p. 85.) A preponderance of evidence thus suggested that A.T.'s mental and physical well-being weighed heavily against a return to Mother's custody.

{¶ 111} A preponderance of the evidence also supported a conclusion that Mr. and Mrs. H would be better able than Mother to address A.T.'s challenges with schoolwork. *See* R.C. 3109.04(F)(1)(d). Additionally, A.T. was reported to be bonded with Mr. and Mrs. H, and her brother E.G. also was present in their household. *See* R.C. 3109.04(F)(1)(c). Finally, Dr. Lilley's testimony regarding Mother's own mental health

challenges also suggested that A.T.'s best interest would be furthered by remaining in Mr. and Mrs. H's home rather than returning to Mother's care. *See* R.C. 3109.04(F)(1)(e).

**{¶ 112}** In challenging the award of legal custody as to A.T., Mother cites only Dr. Lilley's inability to observe Mother's interacting with A.T. and the juvenile court's reliance on hearsay testimony as to why visitations between A.T. and Mother were not occurring. The trial court did not err by considering hearsay evidence for purposes of a legal custody determination. *See* Juv.R. 34(B)(2) (during a dispositional hearing, "the court may admit evidence that is material and relevant, including, but not limited to, hearsay * * *"). The court also had ample evidence from the personal observations of sources other than Dr. Lilley regarding A.T.'s positive interactions with her non-familial custodians, and a preponderance of the evidence demonstrated good cause for A.T. not to be made available for observation while interacting with Mother.

**{¶ 113}** Mother's third assignment of error is overruled as to the juvenile court's award of legal custody of A.T. to Mr. and Mrs. H.

## Conclusion

**{¶ 114}** The final judgments of the juvenile court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck
Sarah E. Hutnik
Marshall G. Lachman

Sara M. Barry
Hon. Helen Wallace